**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**FINANCIAL INFORMATION**
**TECHNOLOGIES, LLC,**

     **Plaintiff,**

**vs.**                                **CASE NO. _____**

**ICONTROL SYSTEMS, USA, LLC,**

     **Defendant.**

_____/

**COMPLAINT AND DEMAND FOR JURY TRIAL**

     **COMES NOW** plaintiff Financial Information Technologies, LLC ("Fintech") and files this complaint against defendant iControl Systems, USA, LLC ("iControl"), and alleges as follows:

**NATURE OF THE ACTION**

     1.    This is an action for injunctive relief and damages in excess of $3 million arising from defendant's misappropriation of confidential business information and trade secrets in violation of the federal Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 ("DTSA") and the Florida Uniform Trade Secrets Act, *Fla. Stat.* §§ 688.001, *et seq.* ("FUTSA"), as well as tortious interference under Florida common law, violation of the Florida Deceptive & Unfair Trade Practices Act ("FDUTPA"), misleading advertising in violation of *Florida Statutes* § 817.41, injurious falsehood under Florida common law, and unfair competition under Florida common law.

## THE PARTIES

2.      Fintech is a Florida corporation with its principal place of business in Tampa, Florida, which is in Hillsborough County.  Fintech is the leader in providing electronic data, analytics, and payments to the beverage alcohol industry.

3.      iControl is a Delaware corporation with its principal place of business in Wilmington, Delaware.  iControl is a direct competitor of Fintech.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction of the subject matter of this action under 28 U.S.C. § 1331 in that this action arises under the laws of the United States, and specifically, 18 U.S.C. § 1030.  This Court also has jurisdiction of the subject matter of this action under 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds the sum of $75,000. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

5.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (c) because, *inter alia*, Fintech's confidential information and trade secrets were misappropriated in Hillsborough County, Florida, in the Middle District of Florida, and because iControl made false statements about Fintech to Fintech's customers in, *inter alia*, Collier County, Florida, in the Middle District of Florida.

## GENERAL ALLEGATIONS

6.      The beverage alcohol industry is a highly regulated industry with strict state-by-state regulations regarding the sale, distribution, and payment for deliveries of beverage alcohol.

2

7.      Over 25 years ago, Fintech began developing a unique and proprietary system and business model that complies with these strict state regulations and improves the process for ordering beverage alcohol products, as well as the account processing and payment reconciliation. Today, Fintech provides customized invoice information and electronic payments for distributors of all sizes in the beverage alcohol industry, including craft brewers, small batch distilleries, boutique wineries, and large beer wholesalers.

8.      The Fintech proprietary systems have revolutionized the beverage alcohol data and payment process for distributors across the country.  As of 2017, Fintech works with more than 2,800 distributors, and Fintech's proprietary systems process beverage alcohol invoices for more than 400,000 relationships nationwide, totaling more than $23 billion annually.

A.      **Fintech's Protectable Interests**

9.      Fintech, through hard work, dedication and significant investment of money and resources beginning in 1989, has earned a reputation as the industry leader in beverage alcohol electronic payment systems and data analytics.

10.     Fintech's proprietary electronic funds transfer ("EFT") services produce a cash equivalent for payment for beer, wine, and spirits invoices.  Fintech's unique suite of proprietary software systems and data analytics tools enables beverage alcohol distributors to streamline business processes and receive every payment in full and on time. Fintech's electronic payment systems and analytics reporting tools also increase data security, ensure compliance with beverage alcohol regulations,

3

and make beverage alcohol payments more convenient.  Significantly, Fintech's EFT services and specialized bank agreements provide a payment method that does not involve Fintech taking title to customer funds, hereinafter referred to as "No Title to Funds."

11.     When Fintech first received approval in 1991 to use EFT as a cash equivalent for the beverage alcohol payments, an electronic payment option was not widely accepted in the beverage alcohol industry.  However, Fintech overcame this obstacle.  It not only persuaded customers to transition to Fintech's EFT system, but also worked with authorities in each state to convince them that Fintech's EFT payment system was consistent with the principles behind each state's alcohol regulations.  Fintech ultimately persuaded each state to declare EFT a cash equivalent.  Fintech is the only provider of EFT services to the beverage alcohol industry that is compliant with the regulations in all 50 states, and available for use in all states with the exception of Rhode Island.

12.     Fintech is now in its 26th year of providing electronic data, data analytics tools, and electronic payment systems to the beverage alcohol industry. Fintech has built its OneSource® system around this business model, creating unique and proprietary functions in, *inter alia*, the following 5 areas:  (1) Data Interfaces; (2) Payment Processing; (3) Data Analytics; (4) User Portal; and (5) Reporting.

13.     Fintech has successfully built its business through developing proprietary software applications and data analytics tools for the beverage alcohol

industry; developing and maintaining, at great expense, valuable long-standing business relationships and substantial goodwill with distributors, retailers, and wholesalers in that industry; and selling its proprietary products and services to those customers using confidential business and marketing strategies.

14.    Fintech reasonably expects that its long-standing customer relationships will continue into the future.

15.    To maintain these long-standing customer relationships and develop new ones, Fintech expends substantial time, effort, and expense developing its confidential business information and trade secrets, which it leverages on a daily basis to serve its customers.

16.    Such confidential information and trade secrets include, but are not limited to: Fintech's proprietary software applications and systems; OneSource® system; unique methods, processes and procedures for the provision of EFT Services; inbound data convertors; the creation of payment files sent to Fintech's partner banks for retransmission to NACHA to effect the debits of the retailers and credits to the distributors; Fintech's EDI process; Fintech's outbound maps; Fintech's outbound remittance files; Fintech's Database structure (schemas – Invoicing & Analytics); Fintech's proprietary file processing techniques; Fintech's proprietary data cleansing techniques; information regarding strategic, marketing, and operational plans; pricing structure, business model, plans and policies; server infrastructure; software and analytics tools under development; data analytics models, techniques, methods, and reports; information regarding Fintech or its

5

affiliates' financial position, financial data and financial affairs; the identities of Fintech or its affiliates' management, executives, officers, directors or personnel and their compensation; Fintech's internal structure; Fintech's new business ventures and potential market affiliations; as well as valuable compilations and information regarding Fintech's customers and prospective customers, including information concerning the identities, relationships, preferences, needs, background, references, internal decision-making hierarchy, contact persons, contact information, requirements, historical revenue data, purchasing tendencies, and history of customers (including both retailers and wholesalers/distributors); sensitive pricing, mark-up, and margin information regarding rates charged to customers for particular Fintech products and services; customer leads; partnership networks; customer projects and proposals in development; and other customer-specific information ("Customer Information"), all of which is collectively referred to herein as Fintech's "Confidential Information and Trade Secrets."

17.    Fintech's Confidential Information and Trade Secrets range widely, are extremely valuable, and include: its unique EFT system, which automates the beverage alcohol data and payment process for distributors across the country; other proprietary software applications that automate additional functions for customers in the beverage alcohol industry, including but not limited to state-by-state regulatory compliance controls; data integrity methods, tools, and techniques; data analytics systems for tracking alcohol purchasing data; distributor and back-office

accounting systems; retailer point of sale system integrations and custom data files; and business intelligence tools.

18.     It has taken Fintech more than 25 years, millions of investment dollars, thousands of development hours, and extensive sales and marketing efforts across the United States to develop its Confidential Information and Trade Secrets. Fintech's Confidential Information and Trade Secrets would provide Fintech's competitors with an unfair advantage if disclosed to or used by or on behalf of Fintech's competitors.

19.     Fintech has also devoted hundreds of thousands of hours and millions of dollars to training its workforce, including its systems analysts, engineers, contractors, sales force, and executives.

20.     Fintech has engaged in efforts that are reasonable under the circumstances to maintain the confidential and proprietary nature of its Confidential Information and Trade Secrets, including, but not limited to, its unique EFT System, proprietary payment and data processing applications, data analytics tools and techniques, and Customer Information.   As a result, Fintech's Confidential Information and Trade Secrets are not generally known to the public, particularly Fintech's competitors.

21.     Fintech's policies and procedures require that its employees, independent contractors, and staff keep its Confidential Information and Trade Secrets strictly confidential, and Fintech restricts access to such information.

22.     Among   other   precautions,   Fintech   assigns   employees   and independent  contractors  confidential,  individual  usernames  and  passwords  to access Fintech's server and email accounts.  In addition, Fintech users are forced to change their password periodically for security purposes.

23.     Fintech  secures  its  confidential  Customer  Information  and  other Confidential  Information  and  Trade  Secrets  on  protected  servers  and  databases, which  only  those  employees  with  appropriate  security  authorizations  can  access. Additionally, access to these servers and databases is tracked to the user based on his or her unique user id and confidential password.

24.     Fintech also employs document-level security to ensure that only those employees  with  appropriate  authorization  can  access  Fintech's  Confidential Information and Trade Secrets using their unique user id and confidential password.

25.     Fintech also requires employees and independent contractors to sign a Confidentiality  and  Non-Compete  Agreement,  pursuant  to  which  employees  and contractors agree to maintain the confidentiality of Fintech's Confidential Information and Trade Secrets, not only during the term of their employment or engagement with Fintech but thereafter.

**B.     iControl's Misappropriation Of Fintech's Confidential Information And Trade Secrets**

26.     iControl  was  formed  in  2005  to  provide  scan-based  trading  systems. Initially, iControl did not offer electronic payment services to the beverage alcohol industry.

27.    In 2013, iControl began discussing the development of a platform to provide electronic data, analytics, and payments to the beverage alcohol industry. To accomplish this goal, iControl solicited the services of Mark Lopez ("Lopez"), Fintech's former Vice President of Operations.

28.    Lopez worked for Fintech from 2000 to 2002, and again from 2009 to May 2012.   As a condition of his employment with Fintech, Lopez executed Confidentiality and Non-Compete Agreement, attached as Exhibit No. 1, and a Consulting Agreement, attached as Exhibit No. 2, (hereinafter, Lopez's 2009 agreements with Fintech shall be referred to collectively as "the Agreements").

29.    The Agreements prescribe the categories of information Fintech deems confidential.  They also contain nondisclosure and confidentiality covenants that preclude Lopez from, among other things, (a) disclosing Fintech's confidential information to third parties, and (b) using Fintech's confidential information for any purpose other than to further Fintech's business. Pursuant to the Agreements, Lopez acknowledged and agreed that the confidentiality and non-disclosure provisions of the Agreements survived the end of each of his terms of employment or engagement.

30.    In reliance on the existence of the nondisclosure, confidentiality, and non-compete covenants contained in the Agreements, Fintech (a) provided Lopez with access to Fintech's Confidential Information and Trade Secrets, and (b) allowed Lopez access to Fintech's customers and Customer Information.

31.     Specifically, Lopez managed the activities of Fintech's activation department and technology department and had access to every aspect of Fintech's Confidential Information and Trade Secrets, including without limitation its EFT services, automated payment, credit identification, and reconciliation services, as well as its analytics services, some or all of which Lopez had a role in developing.

32.     Beginning in 2013, Lopez began providing consulting services to iControl by providing strategy and technology support for the market development, as well as the technology infrastructure development for iControl's platform to provide electronic data, analytics, and payments to the beverage alcohol industry. Then, from March 2015 to the present, Lopez has been employed by iControl as its Executive Vice President of Operations. In connection with each of these roles, Lopez and iControl have misappropriated Fintech's Confidential Information and Trade Secrets to assist iControl in developing its products for the beverage alcohol industry.

33.     Specifically, within the 2015-2016 time frame, iControl has expanded into the area of EFT payment transactions for the beverage alcohol industry and has developed product suites that are nearly identical to Fintech's products.  These products have been developed in such an extremely short period of time and could not have been accomplished without Lopez's and iControl's misappropriation of Fintech's Confidential Information and Trade Secrets.

34.     For example, iControl has developed and released the following products, which are virtually identical to Fintech's products:

10

- In January 2016, iControl released invoice entry, reverse invoice, hold payments and FTP capabilities similar to the proprietary payment processing and data interface components of Fintech's OneSource® that Lopez developed and managed at Fintech;

- In February 2016, iControl released exception reporting similar to functions that Lopez developed at Fintech;

- In April 2016, iControl released a new portal with reports and invoice editing that reflect functionality similar to proprietary functionality in Fintech's FTX that Lopez developed at Fintech;

- In May 2016, iControl released its Invoice Creator that reflects functionality similar to proprietary functionality in Fintech's Incomplete Folder and Invoice Editing that Lopez developed at Fintech;

- In May 2016, iControl implemented its Next-Generation Reconciliation with normalization units and quantity that appears to be the same proprietary functionality that Fintech implemented with Analytics that Lopez managed at Fintech; and

- In July 2016, iControl implemented their "edit any invoice" and "fix invoices" that reflect functionality similar to the proprietary functionality Fintech implemented with its FTX Incomplete Folder and Invoice Editing that Lopez developed at Fintech.

35.     The only way iControl could have developed these complex systems, which are nearly, if not identical, to Fintech's systems, in such a short period of time is by misappropriating Fintech's Confidential Information and Trade Secrets.

36.     iControl was aware of Lopez's confidentiality obligations to Fintech. Despite this knowledge, iControl has caused and induced Lopez to breach his confidentiality obligations by employing him to assist in developing systems nearly identical to the systems he developed or oversaw the development of at Fintech.

37.     Since entering the beverage alcohol industry to provide payment and other electronic services, iControl has begun soliciting Fintech customers to withdraw from their business with Fintech and engage iControl to perform services previously performed by Fintech.

38.     As a result of iControl's unlawful interference with Fintech's advantageous business relationships, Fintech has suffered economic damages that exceed $3 million.

39.     In addition, iControl has disseminated false and disparaging statements about Fintech to Fintech's customers and prospective customers, including knowingly false statements about the capabilities and pricing structure of Fintech's software solutions and services, for the purpose of interfering with Fintech's advantageous business relationships.  For example, iControl has made numerous false and disparaging statements about Fintech to current, former and prospective Fintech customers, and to user conference and trade show attendees.

These statements include, but are not limited to, statements stating, suggesting, or implying the following:

    a. Fintech does not have data integrity or analytics;

    b. Fintech does not offer bi-directional data flow commerce;

    c. Fintech does not offer customers help with credit and discrepancy reconciliation;

    d. Fintech offers only a single solution;

    e. Because Fintech does not provide bi-directional data flow commerce, iControl was chosen to be a Board member of the Beer Industry Electronic Commerce Coalition (a group managed by the National Beer Wholesalers Association), conveniently ignoring the fact that Fintech is the only EFT partner of the NBWA and that the BIECC does not have a Board.

40. iControl's actions as described above caused Lopez to violate the provisions contained in the Agreements. Its actions further constitute unfair competition and involve the past and continued unlawful disclosure and use of Fintech's Confidential Information and Trade Secrets. iControl's acts thus pose an imminent threat of irreparable injury to Fintech.

41. Fintech has no adequate remedy at law for such injuries. Fintech's full damages are not fully ascertainable at present, nor can they be readily calculated with reasonable certainty in the future, as they include damage to Fintech's reputation, good name, and good will for which there is no monetary remedy.

42. The injury that will befall Fintech if iControl is not enjoined outweighs any harm that the issuance of an injunction may inflict on iControl.

43.     The issuance of an injunction as requested herein will, in all respects, serve the public good in that it will promote adherence to contractual and confidentiality obligations and will prevent a Florida-based business from being victimized by unfair and unlawful competition.

44.     All conditions precedent to the relief requested herein have been met, have occurred, or have been waived.

45.     As a result of the unlawful acts of iControl, Fintech has retained the undersigned counsel and is obligated to pay them reasonable attorneys' fees.

**COUNT I**

**DEFEND TRADE SECRETS ACT OF 2016**

46.     Fintech realleges and incorporates herein by reference the allegations contained in Paragraph Nos. 1 through 45 above as if set forth fully herein.

47.     This is an action for damages and injunctive relief under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836.

48.     iControl misappropriated numerous Fintech trade secrets related to its customers, business and methodologies, and systems and tools used for the services it provides to its customers.

49.     The trade secrets misappropriated by iControl derive independent economic value by virtue of not being generally known to, and not being readily ascertainable by, other persons who can obtain economic value from its disclosure or use.

50.    Fintech takes reasonable measures to maintain the secrecy of and protect its trade secrets, including limiting access to them and preventing anyone from accessing such information who is not subject to nondisclosure obligations.

51.    Lopez, through his employment and engagement with Fintech, acquired, had access to, and had direct knowledge of, Fintech's trade secrets as described above.

52.    Lopez was obligated by contract and by applicable law, to refrain from disclosing and/or using Fintech's trade secrets.

53.    iControl knew that Lopez was subject to the duty to maintain the secrecy and the limited use of the trade secrets.

54.    Nonetheless, iControl misappropriated and used Fintech's trade secrets for their benefit by acquiring them through improper means for use in competing with Fintech.

55.    As a direct and proximate result of iControl's misappropriation, disclosure, and use of Fintech's trade secrets in violation of the DTSA, Fintech has suffered and will continue to suffer immediate and irreparable injury to its business, goodwill, and income.  This injury, while substantial, may be difficult to calculate with precision.   At present the monetary damage Fintech has suffered exceeds $3 million.

56.    In addition to causing Fintech to suffer monetary damages, iControl has caused Fintech to suffer damages for which it has no adequate remedy at law to

protect it from the unlawful and continuing misappropriation, disclosure, or use of its trade secrets by iControl.

57.     Fintech has a substantial likelihood of success on the merits of this claim because of iControl's misappropriation, disclosure and/or use of Fintech's trade secrets.

58.     The threat of harm to Fintech in the absence of injunctive relief far outweighs the threat of harm to iControl if an injunction is granted.  Fintech faces substantial financial loss, loss of goodwill, and loss of its competitive position in the marketplace, whereas the only "hardship" imposed on iControl would be to prevent it from reaping any illicit gain or benefit from misappropriation, disclosure, and use of Fintech's trade secrets.

59.     The public interest would be served by granting the relief sought in that the public clearly favors preventing entities such as iControl from profiting from their improper and unlawful conduct.

60.     The Fintech trade secrets are related to products and services used in interstate commerce, as Fintech provides services to clients across the United States.

**WHEREFORE,** Fintech demands judgment against iControl as follows:

(a)     Temporarily and permanently enjoining iControl from using or disclosing any of Fintech's trade secrets;

(b)     Awarding Fintech compensatory damages, including both actual loss and unjust enrichment, in an amount to be proven at trial;

(c)     Awarding Fintech its attorneys' fees and costs and interest; and

(d)     Granting such other relief as the Court deems just and proper.

**COUNT II**

**FLORIDA UNIFORM TRADE SECRETS ACT**

61.     Fintech realleges and incorporates herein by reference the allegations contained in Paragraph Nos. 1 through 45 above as if set forth fully herein.

62.     This is an action for damages and injunctive relief under the Florida Uniform Trade Secrets Act ("FUTSA"), *Fla. Stat.* Ch. 688.

63.     iControl misappropriated numerous Fintech trade secrets related to its customers, business and methodologies, and systems and tools used for the services it provides to its customers.

64.     The trade secrets misappropriated by iControl derive independent economic value by virtue of not being generally known to, and not being readily ascertainable by, other persons who can obtain economic value from its disclosure or use.

65.     Fintech takes reasonable measures to maintain the secrecy of and protect its trade secrets, including limiting access to them and preventing anyone from accessing such information who is not subject to nondisclosure obligations.

66.     Lopez, through his employment and engagement with Fintech, acquired, had access to, and had direct knowledge of Fintech's trade secrets as described above.

67.    Lopez was obligated by contract and by applicable law, to refrain from disclosing and/or using Fintech's trade secrets.

68.    iControl knew that Lopez was subject to the duty to maintain the secrecy and the limited use of the trade secrets.

69.    Nonetheless, iControl misappropriated and used Fintech's trade secrets for their benefit by acquiring them through improper means for use in competing with Fintech.

70.    As a direct and proximate result of iControl's misappropriation, disclosure, and use of Fintech's trade secrets in violation of the FUTSA, Fintech has suffered and will continue to suffer immediate and irreparable injury to its business, goodwill, and income.  This injury, while substantial, may be difficult to calculate with precision.   At present the monetary damage Fintech has suffered exceeds $3 million.

71.    In addition to causing Fintech to suffer monetary damages, iControl has caused Fintech to suffer damages for which it has no adequate remedy at law to protect it from the unlawful and continuing misappropriation, disclosure, or use of its trade secrets by iControl.

72.    Fintech has a substantial likelihood of success on the merits of this claim because of iControl's misappropriation, disclosure and/or use of Fintech's trade secrets.

73.    The threat of harm to Fintech in the absence of injunctive relief far outweighs the threat of harm to iControl if an injunction is granted.  Fintech faces

18

substantial financial loss, loss of goodwill, and loss of its competitive position in the marketplace, whereas the only "hardship" imposed on iControl would be to prevent it from reaping any illicit gain or benefit from misappropriation, disclosure, and use of Fintech's trade secrets.

74.     The public interest would be served by granting the relief sought in that the public clearly favors preventing entities such as iControl from profiting from their improper and unlawful conduct.

75.     The misappropriation by iControl was willful and malicious. Accordingly, Fintech is entitled to an award of exemplary damages and attorneys' fees pursuant to § 688.005, Fla. Stat.

**WHEREFORE,** Fintech demands judgment against iControl as follows:

(a)     Temporarily and permanently enjoining iControl from using or disclosing any of Fintech's trade secrets;

(b)     Awarding Fintech compensatory and exemplary damages, including both actual loss and unjust enrichment, in an amount to be proven at trial;

(c)     Awarding Fintech its attorneys' fees and costs and interest; and

(d)     Granting such other relief as the Court deems just and proper.

**COUNT III**

**TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS**

76.     Fintech realleges and incorporates herein by reference the allegations contained in Paragraph Nos. 1 through 45 above as if set forth fully herein.

77.     Fintech had advantageous business relationships with its customers and prospective customers, the identity of which is confidential and subject to disclosure only upon the parties' execution of a comprehensive confidentiality agreement or the entry of a protective order by the Court.

78.     iControl is aware of Fintech's advantageous business relationships with its customers and prospective customers.

79.     iControl intentionally interfered with Fintech's relationships with its customers and prospective customers in order to cause those customers to leave Fintech and engage iControl for the services Fintech provided.

80.     The actions of iControl as alleged herein were calculated and designed to impair, impede and damage Fintech's legitimate business interests by unlawful means.

81.     Specifically, iControl knowingly made or caused to be made false and disparaging statements about Fintech's products, services, and capabilities to Fintech's customers and prospective customers in order to persuade them to abandon Fintech and engage iControl to perform services for which they previously engaged Fintech or were considering engaging Fintech.

82.     Such conduct is without justification and constitutes an unlawful, tortious, wrongful, unfair, intentional malicious interference with Fintech's advantageous business relationships.

20

83.     The conduct of iControl constitutes a tortious interference with Fintech's advantageous business relationships and, as a result, Fintech is entitled to recover damages in an amount to be determined at trial.

**WHEREFORE,** Fintech demands judgment against iControl as follows:

(a)     Temporarily and permanently enjoining iControl from wrongfully interfering with Fintech's advantageous business relationships;

(b)     Awarding Fintech compensatory damages in an amount to be proven at trial; and

(c)     Granting such other relief as the Court deems just and proper.

## COUNT IV

## <u>TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIP</u>

84.     Fintech realleges and incorporates hereby by reference the allegations contained in Paragraph Nos. 1 through 45 above as if fully set forth herein.

85.     iControl was aware of Lopez's contractual obligations to Fintech.

86.     iControl has induced or otherwise caused Lopez to violate the terms of the Agreements.

87.     The actions of iControl as alleged herein were calculated and designed to impair, impede and damage Fintech's legitimate business interests by unlawful means and such conduct is without justification and constitutes an unlawful, tortious, wrongful, unfair, and intentional malicious interference with Fintech's contractual rights

88.     The conduct of iControl constitutes a tortious interference with Fintech's contractual rights and, as a result, Fintech is entitled to recover damages in an amount of be determined at trial.

**WHEREFORE,** Fintech demands judgment against iControl as follows:

(a)     Awarding Fintech compensatory damages in an amount to be proven at trial; and

(b)     Granting such other relief as the Court deems just and proper.

**COUNT V**

**<u>VIOLATION OF FLORIDA DECEPTIVE & UNFAIR TRADE PRACTICES ACT</u>**

89.     Fintech realleges and incorporates hereby by reference the allegations contained in Paragraph Nos. 1 through 45 above as if fully set forth herein.

90.     iControl engaged in the unfair methods of competition, unconscionable acts or practices, and unfair and deceptive acts or practices alleged herein, in conducting its business.

91.     The unfair methods of competition, unconscionable acts and practices, and unfair or deceptive acts in which iControl engaged in conducting its business include misappropriation of trade secrets for the benefit of iControl in violation of DTSA and FUSTA, as alleged in Counts I and II; and intentional interference with Fintech's advantageous business relationships for the benefit of iControl in derogation of Florida common law, as alleged in Count III.

22

92.     These unfair methods of competition, unconscionable practices, and unfair and deceptive acts, are prohibited by *Fla. Stat.* § 501.201, the Florida Deceptive & Unfair Trade Practices Act ("FDUTPA").

93.     As a direct and proximate result of iControl's violations of the FDUTPA, Fintech has suffered and will continue to suffer economic losses and irreparable injuries.

94.     The Court has jurisdiction to enjoin the past, current and future violations of the FDUTPA pursuant to *Fla. Stat.* § 501.211(1), and is authorized to award actual damages for such violations pursuant to *Fla. Stat.* § 501.211(2).

95.     Fintech is also entitled to recover its attorneys' fees incurred in the prosecution of this action, pursuant to *Fla. Stat.* § 501.2105.

**WHEREFORE,** Fintech demands judgment against iControl as follows:

(a)     Temporarily and permanently enjoining iControl from engaging in unfair methods of competition, unconscionable acts or practices and unfair and deceptive acts and practices.

(b)     Awarding Fintech compensatory damages in an amount to be proven at trial;

(c)     Awarding Fintech its attorneys' fees and costs and interest; and

(d)     Granting such other relief as the Court deems just and proper.

## COUNT VI

## MISLEADING ADVERTISING IN VIOLATION OF FLA. STAT. § 817.41

96.     Fintech realleges and incorporates hereby by reference the allegations contained in Paragraph Nos. 1 through 45 above as if fully set forth herein.

97.     iControl made misrepresentations of material fact, that it knew or should have known to be false, that were intended to induce Fintech's customers and prospective customers to engage iControl, and that resulted in lost business to Fintech.

98.     Specifically, iControl knowingly made or caused to be made false and misleading statements about Fintech's products, services, and capabilities to Fintech's customers and prospective customers in order to persuade them to abandon Fintech and engage iControl to perform services for which they previously engaged Fintech or were considering engaging Fintech.

99.     iControl knew or should have known the statements about Fintech's products, services and capabilities were false and misleading at the time it made them and also knew or should have known that the statements would induce customers and prospective customers to rely on them.

100.    As a direct and proximate result of iControl's unlawful conduct, Fintech has suffered and will continue to suffer economic losses and irreparable injuries.

101.    Fintech is entitled to recover its attorneys' fees incurred in the prosecution of this action, pursuant to *Fla. Stat.* § 817.41(6).

**WHEREFORE,** Fintech demands judgment against iControl as follows:

(a)     Awarding Fintech compensatory damages in an amount to be proven at trial;

(b)     Awarding Fintech punitive damages in an amount to be determined at trial;

(c)     Awarding Fintech its attorneys' fees and costs and interest; and

(d)     Granting such other relief as the Court deems just and proper.

**COUNT VI**

**<u>INJURIOUS FALSEHOOD</u>**

102.    Fintech realleges and incorporates hereby by reference the allegations contained in Paragraph Nos. 1 through 45 above as if fully set forth herein.

103.    iControl communicated falsehoods to third parties, that he knew to be false, that were intended to induce Fintech's customers and prospective customers to abandon Fintech and engage iControl, and that resulted in lost business to Fintech.

104.    Specifically, iControl knowingly made or caused to be made false statements about Fintech's products, services, and capabilities to Fintech's customers and prospective customers in order to persuade them to abandon Fintech and engage iControl to perform services for which they previously engaged Fintech or were considering engaging Fintech.

105.    iControl knew the statements about Fintech's products, services and capabilities were false at the time it made them and also knew or should have known

that the statements would induce customers and prospective customers to rely on them.

106.    As a direct and proximate result of iControl's unlawful conduct, Fintech has suffered and will continue to suffer economic losses and irreparable injuries.

**WHEREFORE,** Fintech demands judgment against iControl as follows:

(a)    Awarding Fintech compensatory damages in an amount to be proven at trial;

(b)    Awarding Fintech punitive damages in an amount to be determined at trial;

(c)    Awarding Fintech its attorneys' fees and costs and interest; and

(d)    Granting such other relief as the Court deems just and proper.

## COUNT VII

## <u>UNFAIR COMPETITION</u>

107.    Fintech realleges and incorporates hereby by reference the allegations contained in Paragraph Nos. 1 through 45 above as if fully set forth herein.

108.    iControl engaged in unfair methods of competition in conducting the business of iControl.

109.    Fintech and iControl compete for a common pool of customers.

110.    iControl knowingly made or caused to be made false and misleading statements about Fintech's products, services, and capabilities to Fintech's customers and prospective customers in order to persuade them to abandon Fintech

and engage iControl to perform services for which they previously engaged Fintech or were considering engaging Fintech.

111.    These false and misleading statement were likely to lead to consumer confusion about the products, services and capabilities of Fintech and iControl.

112.    As a direct and proximate result of iControl's false and misleading statements, Fintech has suffered and will continue to suffer economic losses and irreparable injuries.

**WHEREFORE,** Fintech demands judgment against iControl as follows:

(a)    Temporarily and permanently enjoining iControl from engaging in unfair methods of competition.

(b)    Awarding Fintech compensatory damages in an amount to be proven at trial;

(c)    Awarding Fintech punitive damages in an amount to be determined at trial;

(d)    Awarding Fintech its attorneys' fees and costs and interest; and

(e)    Granting such other relief as the Court deems just and proper.

### Jury Trial Demanded

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated this 24th day of January, 2017.

Respectfully submitted,

/s/Richard C. McCrea, Jr.
Richard C. McCrea, Jr.
Florida Bar No. 351539
Email:  mccrear@gtlaw.com

Catherine H. Molloy
Florida Bar No. 33500
Email: molloyk@gtlaw.com
**GREENBERG TRAURIG, P.A.**
101 E. Kennedy Boulevard
Suite 1900
Tampa, Florida  33602
Telephone: (813) 318-5700
Facsimile:  (813) 318-5900
*Attorneys for Plaintiff*

28