UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FINANCIAL INFORMATION
TECHNOLOGIES, INC.,

        Plaintiff,

v.                                            CASE NO. 8:17-cv-190-T-23MAP

iCONTROL SYSTEMS, USA, LLC,

        Defendant.

_____/

## REPORT AND RECOMMENDATION

Financial Information Technologies (Fintech), the dominant competitor, has leveled a host of business torts (misappropriation of trade secrets, tortious interference with business relationships, deceptive and unfair trade practice violations, misleading advertising, and injurious falsehood) against iControl, its upstart competitor.  And the factual inquiry for much of this focuses on what protected information, if any, iControl mined from the executives it lured away years ago from Fintech to its advantage.  Despite the case's fact-intensive nature, iControl says it deserves summary judgment, broadly contending that the record evidence does not support Fintech's claims, that Fintech's damages are speculative, and that many of the Fintech's claims are barred by the statute of limitations (doc. 68).  Having evaluated the summary judgment record, I recommend that iControl's motion be denied but for the following: Fintech's claims of misappropriation of its customer list, regulatory map, no title to funds process and its analytic reports as alleged in Count II; iControl's alleged defamatory statements that Fintech does not have data integrity or analytics and that Fintech does not offer customers help with credit and

discrepancy reconciliation as alleged in Count VII (mislabeled as VI); and as to Fintech's defamation-related claims in Counts III, VI, Count VII (mislabeled as VI)  and Count VIII (mislabeled VII).[1]

   I.     *Standard of Review*

Motions for summary judgment should only be granted when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Jackson v. BellSouth Telecomm.*, 372 F.3d 1250, 1279-80 (11th Cir. 2004).  The existence of some factual disputes between the litigants will not defeat an otherwise properly supported summary judgment motion; "the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (emphasis in original).  The substantive law applicable to the claimed causes of action will identify which facts are material.  *Id.*  Essentially, an issue of fact is "material" if, under the applicable substantive law, it might affect the outcome of the case, and an issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party.  *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004).

The moving party bears the initial responsibility to inform the court of the basis for its motion and to identify the portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it contends demonstrate the absence

---

[1] The District Judge referred iControl's Motion for Summary Judgment (doc. 68) to me for a report and recommendation (doc. 91). 28 U.S.C. § 636(b)(1)(B). Fintech's Memorandum of Law in Opposition is at doc. 80.

of a genuine issue of material fact.  *Id.* at 1260.  For issues on which the non-movant bears the burden of proof at trial, the moving party may show the court that there is an absence of evidence to support the non-moving party's case, or it may support its motion for summary judgment with affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial.  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115-16 (11th Cir. 1993).  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.  *Tolan v. Cotton*, 134 S. Ct. 1861, 1863, 1866 (2014); *Fitzpatrick*, 2 F.3d at 1116-17.  In considering the evidence, the court resolves all reasonable doubts about the facts in favor of the non-moving party and draws all justifiable inferences in its favor.  *Hickson*, 357 F.3d at 1260.  The court does not, however, weigh the evidence or make findings of fact.  *Anderson*, 477 U.S. at 255.

## II.     Background

Fintech dominates the business of providing retailers in the alcoholic beverage industry with third-party electronic fund transfer services ("EFT").  iControl is the relatively new upstart. This EFT payment initiation and related services for the payment of alcoholic beverage invoices is also known as "regulated commerce." More specifically, Fintech and iControl pay invoices of alcoholic suppliers on behalf of retailers by initiating the transfer of funds via the automated clearing house "ACH" process. Fintech alleges that it has been developing a unique and proprietary system and business model that improved that process for ordering alcoholic beverage products as well as the account processing and payment reconciliation for over 25 years (doc. 1 at ¶ 7). Specifically, from 2002 to 2016, Fintech paid over $10 million to its development team to design its proprietary software platform. iControl began competing with Fintech in the regulated industry

in 2013. The dispute between the parties arises from the alleged speed with which iControl was able to develop its competing software and the timing of its entry into this regulated industry as related to its concomitant utilization of the services of two of Fintech's former employees, Andrew Sanderson and Mark Lopez, to develop its competing software.

Sanderson worked for Fintech from about August of 2008 through January 2012 as a regional account executive until he was promoted to National Accounts Director, where he was responsible for managing many of Fintech's major accounts. Lopez first worked for Fintech as a systems analyst in January 2000, until he resigned in 2002. In September 2009, Lopez returned to Fintech as an independent contractor, and on September 15, 2009, he signed a Confidentiality and Non-Compete Agreement (the "Contractor Confidentiality Agreement")(doc. 1-1). The Contractor Confidentiality Agreement provided that Lopez would not disclose, disseminate or publish any confidential information, as defined by the agreement, during "the term of the Contractor's engagement, and following termination of the Contractor's engagement, whether the Contractor's termination is voluntary or involuntary, or with or without cause…." (doc. 1-1 at ¶ 2). Subsequently, in October 2009, he executed a letter agreement (the "Contractor Agreement") related to his independent contractor position, which stated the term of the agreement was three months, ending December 31, 2009, and provided the following terms regarding proprietary and confidential information:

> In the course of providing services to Fintech, you will have or continue to have access to certain proprietary and confidential information regarding the business of Fintech and its business relationships, including without limitation, information regarding strategic, marketing, or operational plans; unique methods, processes and procedures for the provision of EFT Services; information concerning the identities, relationships, needs, background, requirements and history of customers (including both retailers and wholesalers/distributors); Fintech's internal structure…. (All of the foregoing shall hereafter be referred to as "Confidential

4

Information"). You acknowledge and agree that you either have acquired or will acquire said Confidential Information under circumstances giving rise to a duty to maintain its secrecy and/or limit its use to the benefit of Fintech. You will ensure that you will not, directly or indirectly, use, transmit or disclose to any person, concern or entity, any of Fintech's Confidential Information for any purpose which would harm Fintech's business or create a competitive disadvantage to Fintech. This confidentiality provision survives the termination of this agreement.

(doc. 1-2 at 3).

On December 1, 2009, Lopez executed a new letter agreement whereby he became Vice President of Operations and a full-time employee of Fintech (the "Employment Agreement")(doc. 68-2). The Employment Agreement did not contain confidentiality restrictions but required the execution of a separate confidentiality and noncompete agreement. It is undisputed, however, that Lopez never executed the confidentiality and noncompete agreement required. Lopez managed the activities of Fintech's activation department and technology department and developed and maintained Fintech's proprietary customer applications and data interfaces.

Lopez left Fintech in May 2012 to accept employment in California in an unrelated industry. Fintech does not claim that Lopez has violated any non-compete or non-solicitation agreements. There is also no dispute that that iControl is free to compete against Fintech and to solicit from the same pool of customers.

iControl was formed in 2005 to provide similar scan-based trading systems to retailers and distributors but, initially, did not offer electronic payment services to the beverage alcohol industry (doc. 1 at ¶ 26). In early 2013, Sanderson began working for iControl as its National Sales Director and then Senior VP of payment solutions. By 2013, iControl had made modifications to its existing software platform to enable it to service alcohol clients. iControl serviced its first client in the alcohol industry in April 2013, prior to hiring and without any assistance from Lopez. In or about

June 2013, iControl engaged Lopez as an independent contractor. In 2015, iControl promoted Lopez, hiring him as its full-time Executive Vice President of Operations, and later Chief Operating Officer. Fintech alleges that, from January to July 2016, iControl released many new software features similar or identical to ones Lopez developed or maintained at Fintech. Fintech alleges that iControl misappropriated Fintech's trade secrets and confidential information by soliciting confidential information from Fintech's current and former customers and vendors and by engaging the services of Sanderson and Lopez in order to create its competing software suite in a fraction of the time it took Fintech to develop its software.

Fintech filed this action on January 25, 2017,[2] and alleges that iControl misappropriated trade secrets in violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836 ("DTSA") and the Florida Uniform Trade Secrets Act, Fla. Stat. §§ 688.001, *et seq.* ("FUTSA") (doc. 1).[3] Fintech also alleges claims for tortious interference with business and contractual relationships under Florida common law, violation of the Florida Deceptive & Unfair Trade Practices Act ("FDUTPA"), misleading advertising in violation of Florida Statutes § 817.41, and injurious falsehood and unfair competition under Florida common law (doc 1). iControl now moves this Court for summary judgment arguing that the record evidence does not support the claims alleged

---

[2] Fintech filed a lawsuit against Sanderson on September 29, 2015, which is currently pending in the Circuit Court of the Thirteenth Judicial Circuit in and for Hillsborough County, Florida, Case No. 15-CA-008938. Fintech filed a lawsuit against Lopez on September 30, 2015, which was removed to this Court, *Financial Information Technologies, Inc. v. Lopez*, 8:15-cv-2784-T-30AEP, and ultimately dismissed with prejudice on May 9, 2017, based upon a joint stipulation of the parties. The claims in the Sanderson and Lopez actions are substantively similar to the claims in this action.

[3] Fintech does not allege that iControl misappropriated or utilized Fintech's source code (doc. 39 at 3).

and that the majority of claims are barred by the statute of limitations as Fintech was aware of the alleged claims in 2013 but did not file this action until 2017 (doc. 68).

III. *Analysis*

A. *Defend Trade Secrets Act (Count I)*

iControl argues that Fintech has no claim pursuant to the Defend Trade Secrets Act ("DTSA") because any wrongful act occurred prior to the DTSA's enactment and is therefore barred (doc. 68 at 7). The DTSA "creates a private cause of action in favor of the 'owner of a trade secret that is misappropriated ... if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce.'" *Adams Arms, LLC v. Unified Weapon Sys., Inc.*, No. 8:16-cv-1503-T-33AEP, 2016 WL 5391394, at *5 (M.D. Fla. Sept. 27, 2016)(citing 18 U.S.C. § 1836(b)(1)).  The DTSA, by its own terms, applies to "any misappropriation of a trade secret ... for which any act occurs on or after the date of the enactment of [the] Act."  Pub. L. No. 114-153, § 2(e), 18 U.S.C. § 1836. The DTSA was enacted on May 11, 2016.  *Avago Techs. U.S. Inc. v. Nanoprecision Prod., Inc.*, No. 16-cv-03737-JCS, 2017 WL 412524, at *8 (N.D. Cal. Jan. 31, 2017).

Fintech alleges that iControl misappropriated numerous Fintech trade secrets related to its customers, business and methodologies, and systems and tools used for the services it provides to its customers (doc. 1 at ¶ 48). "Misappropriation" under the DTSA includes both acquisition and disclosure of trade secrets.  *Id.* (citing 18 U.S.C. §§ 1839(5)(A) & (B)). More specifically, "misappropriation occurs when: (1) a person acquires the trade secret while knowing or having reason to know that he or she is doing so by improper means; (2) a person who has acquired or derived knowledge of the trade secret discloses it without the owner's consent; or (3) when a

person who has acquired or derived knowledge of the trade secret uses it without the owner's consent." *Roeslein & Assocs., Inc. v. Elgin*, No. 4:17 CV 1351 JMB, 2018 WL 1138465, at *8 (E.D. Mo. Mar. 2, 2018)(citing *Mission Measurement Corp. v. Blackbaud, Inc.*, No. 16 C 6003, 2016 WL 6277496, at *4 (N.D. Ill. Oct. 27, 2016) (citing 18 U.S.C. § 1839(5))). Even if a trade secret was acquired or developed prior to May 11, 2016, a plaintiff may recover where disclosure to the public occurred after that date. *Adams Arms*, 2016 WL 5391394, at *5-7.

iControl contends the alleged acquisition of trade secrets necessarily occurred before Lopez's May 2012 resignation from Fintech and the alleged disclosures occurred before the May 11, 2016, enactment of the DTSA (doc. 68 at 8). iControl points to the general allegations (realleged and incorporated into Count I) that iControl used misappropriated information to expand into the alcohol industry "within the 2015-2016 time frame" and that it released the misappropriated product features in January, February, April, May and July of 2016 (doc. 68 at 8 citing doc. 1 at ¶¶ 33-34). Fintech does not contend that the product features released in January, February and April 2016 are somehow exempt from the May 11, 2016, enactment cut-off date. iControl's July 2016 release of the "edit any invoice" and "fix invoices" features (doc. 1 at ¶ 34), however, clearly occurred after the enactment date, and Fintech asserts, and the Court agrees, that iControl has similarly failed to meet its burden on summary judgment to show that iControl's May releases of its Invoice Creator and Next-Generation Reconciliation products (doc. 1 at ¶ 34) occurred before May 11, 2016, because there has been no proffer of evidence as to the exact release dates of these products in May 2016. *See* doc. 90 at 15 n.3.

iControl's argument that the May and July disclosures are continuing misappropriations relating back to their acquisitions is unavailing  (doc. 68 at 8 citing 18 U.S.C. § 1836(d)). While

8

the DTSA expressly provides that "a continuing misappropriation constitutes a single claim of misappropriation," this language is from the DTSA's statute of limitations provision and applies only to determinations of timeliness of a DTSA claim. *Avago Techs.*, 2017 WL 412524, at *9; *Adams Arms*, 2016 WL 5391394, at *5. This does not preclude a DTSA claim based on acts that occurred after the effective date of the statute. *Id.* In other words, a claim based on the initial disclosure of a trade secret after the effective date of the statute is not precluded by relation back to acquisition of the trade secret prior to the effective date of the statute. Accordingly, summary judgment should be denied as to Count I on this ground.[4]

## B. *Florida Uniform Trade Secrets Act (Count II)*

In order to prove a claim for misappropriation of trade secrets under FUTSA, a plaintiff must prove that: (1) it possessed confidential information and took reasonable steps to protect its secrecy; (2) defendant misappropriated the confidential information; and (3) plaintiff's confidential information derives independent economic value from not being generally know or ascertainable through proper means. Fla. Stat. § 688.002; *Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998); *ABB Turbo Sys. AG v. Turbousa, Inc.*, 774 F.3d 979, 985 (Fed. Cir. 2014); *Medimport S.R.L. v. Cabreja*, 929 F. Supp. 2d 1302, 1322 (S.D. Fla. 2013). iControl argues that Fintech's FUTSA claim fails as a matter of law because it is barred by the statute of limitations, Fintech failed to protect the alleged trade secrets, and there was no misappropriation because iControl began servicing clients in the alcohol industry prior to hiring Lopez as a consultant and that it did not utilize Fintech's source code or receive any Fintech documents from Lopez (doc. 68 at 8-9).

---

[4] iControl also asserts that the DTSA claim is barred by the statute of limitations, which is discussed *infra* in §III.B.1.

1.      *Statute of Limitations*

iControl argues that both the FUTSA and the DTSA have three-year statutes of limitations and the record evidence demonstrates conclusively that those claims for misappropriation are time-barred (doc. 68 at 10). Under both the FUTSA and the DTSA, an action for misappropriation must be brought within three years after the misappropriation "is discovered or by the exercise of reasonable diligence should have been discovered." Fla. Stat. § 688.007; 18 U.S.C. § 1836(d). Fintech filed its complaint on January 25, 2017; so the statute of limitations dictates that the misappropriation claims are untimely if the misappropriation was discovered, or by the exercise of reasonable diligence should have been discovered, prior to January 25, 2014. Fintech responds that there are disputed issues of fact as to whether Fintech should have known before January 25, 2014, that iControl misappropriated trade secrets and that, while Fintech might have suspected that iControl was using Fintech's trade secrets to develop its competing software, Fintech was not in a position to confirm that suspicion until obtaining the necessary facts (doc. 80 at 16-17).

The record evidence cited by iControl, at best, establishes that Fintech was interested in iControl's entry into the marketplace as a competitor and may have been suspicious about such activities involving misappropriation prior to January 25, 2014, but does not show that a reasonable investigation by Fintech would have produced facts sufficient to confirm this suspicion and justify bringing suit. *Knights Armament Co. v. Optical Sys. Tech., Inc.*, 636 F. Supp. 2d 1283, 1293 (M.D. Fla. 2009)(citing cases holding that suspicion alone is not sufficient to run the statute of limitations), *aff'd*, 654 F.3d 1179 (11th Cir. 2011). A genuine issue of material fact exists on the question of whether Fintech discovered or should have discovered before January 25, 2014, that

iControl misappropriated trade secrets such that summary judgment should be denied on this ground.

### 2.      No Misappropriation

iControl contends that the alleged trade secrets identified by Fintech were not misappropriated because iControl developed its software and system before hiring Lopez (doc. 68 at 10).   While there is no dispute that iControl did develop its software and system before hiring Lopez, at least to a degree that it was able to service its first client in the alcohol industry in April 2013, a genuine issue of material fact exists as to whether iControl misappropriated Fintech's trade secrets in the continued development of its software and system.

### 3.      Fintech Failed to Protect the Secrecy of Its Information

iControl next argues that Fintech did not take adequate steps to maintain the secrecy of its information, which, in turn, disqualifies it for trade secret protection (doc. 68 at 11). *See Border Collie Rescue, Inc. v. Ryan*, 418 F. Supp. 2d 1330, 1338 (M.D. Fla. 2006)(information that is generally known or readily accessible to third parties does not qualify for trade secret protection). iControl contends that Fintech not only failed to take appropriate steps to maintain the confidentiality of its alleged trade secrets, but also actively publicized much of the confidential information. iControl identifies five examples of Fintech's publicizing its own trade secrets: customer list, regulatory map, "Fintech Process," no title to funds process and analytic reports (doc. 68 at 11-12). With the exception of the "Fintech Process," Fintech does not dispute that these other trade secret examples were made available to the public. Instead, Fintech only asserts that iControl's reference to the "Fintech Process" is vague and fails to identify any process at all and that it is not the analytic reports themselves that are trade secrets, but the software design that

11

creates the reports (doc. 80 at 17). Fintech also points to the absence of other trade secrets from iControl's examples such as Fintech's reconciliation or analytics features or its pricing schedule.

As to the "Fintech Process," iControl asserts that "Fintech previously provided a video link on its website that demonstrated its process" (doc. 68 at 12). The Court has reviewed iControl's Exhibit K, which was identified the video link referenced (doc. 70, flash drive 8/28/13) and purports to be a Fintech tutorial for potential customers about Fintech's "FTX Internet Services." The Court agrees that this reference to the "Fintech Process" is vague and fails to sufficiently identify the "process" that was made public. However, based on Fintech's lack of opposition to iControl's argument that the other particular trade secrets were not adequately protected, iControl's motion for summary judgment should be granted as to Fintech's claims of misappropriation of its customer list, regulatory map, no title to funds process and its analytic reports themselves. *Tolan*, 134 S. Ct. at 1863, 1866. However, iControl has not established that it is entitled to summary judgment as to Fintech's claims of misappropriation of any other alleged trade secrets.

### 4.  *Broad Categories of Information Cannot Qualify as Trade Secrets*

iControl asserts that Fintech's claims are deficient to the extent Fintech fails to identify the alleged trade secrets with specificity and points to Fintech's responses to discovery requests regarding the same (doc. 68 at 12). Fintech contends that it has adequately identified its trade secrets as it, subsequent to iControl filing its motion for summary judgment, amended its interrogatory response as to the trade secrets allegedly misappropriated by iControl (doc. 80-9). The supplemental response delineates in further detail the trade secrets previously identified as sales techniques, customer information, and proprietary file processing techniques, and it adds "Fintech's techniques for debiting delivery fees, split cases, and taxes; Fintech's technique for

handling header adjustments; Fintech's techniques for handling debit filters; Fintech's rounding techniques; and Fintech's method of handling and reconciling VINs and Retailers' item numbers" (doc. 80-9). Fintech also points to trade secrets described in "exhaustive detail" in Zatkovich's expert report (doc. S47-1 at 12-16, 19-25) and "clearly articulated" in the email correspondence between Lopez and iControl (S90-16 & S47-8 at 11-14). The Court finds that the trade secrets are alleged with reasonable particularity, and the motion should be denied on this ground.

### 5.    *Lack of Record Evidence of Misappropriation*

iControl argues that it is entitled to summary judgment because there is no evidence that Lopez conveyed to iControl or utilized for the benefit of iControl any Fintech document containing alleged trade secrets of Fintech; there is no evidence that it used a substantial portion of a Fintech trade secret; and Fintech relies only on circumstantial evidence of misappropriation, such as the similarity of the parties' software and the speed with which iControl developed its product (doc. 68 at 14-16).

iControl's first argument fails for two reasons. First, Lopez admitted that he retained confidential Fintech e-mails (doc. 90-6 at 157:1-158:19, Exhs. 18 & 19; 109:19-110:9, 154:19-156:2, Exh. 16). Second, conveyance of a physical document is not required for misappropriation of a trade secret, and iControl has not cited any authority to the contrary. "Although the distinction between information retained in memory and information embodied in appropriated records can be relevant in determining whether the information qualifies for protection, the defendant's reliance on memory is not a defense if the information is in fact a trade secret." RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 42 cmt. d, reporter's note (citations omitted)(AM. LAW INST. 1995).

iControl's next argument likewise fails. iControl seems to be asserting that it cannot be liable for misappropriation of trade secrets because it did not use any portion, let alone a "substantial portion," of Fintech's trade secrets if considering Fintech's software platform as a whole because it is undisputed that iControl did not utilize Fintech's source code, and iControl had independently created software for its core business of scan-based trading and the processing of other non-alcohol payments, which system it then utilized to service customers in the alcohol industry. In other words, iControl contends that the contribution made by the alleged misappropriated trade secrets, if any, is so slight that iControl's software can be said to be derived from other sources of information or from independent creation such that Fintech's trade secrets have not been "used" for purposes of imposing liability. *See Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F3d 1284, 1293 (11th Cir. 2003).

Fintech quantifies the trade secrets at issue differently, *i.e.*, not as a single trade secret consisting of Fintech's entire software platform, but, instead, as multiple trade secrets consisting of the discrete software design elements and proprietary functions in Fintech's software. Fintech cites to *Ajaxo Inc. v. E\*Trade Group, Inc.*, 135 Cal. App. 4th 21, 53-54 (Cal. 6th Ct. App. 2005), to illustrate this quantification of multiple individual trade secrets, where trade secrets misappropriated from Ajaxo's stock-trading software included "how it dealt with the difficult problem of 'cache,'" "buffering the cookie," "how to sustain the session," "support for session specific cookies with HTTPclient," and "infrastructure for data cleansing support." *See also Telex Corp. v. Int'l Bus. Machs. Corp.*, 510 F2d 894, 911 n.10, 932 (10th Cir. 1975)(where it took IBM six years and $30,000,000 to develop the "Merlin project" and Telex, "through the use of IBM trade secrets," was able to get more than halfway through its development of an equivalent

14

technology in just eighteen months, the jury reasonably awarded IBM $10,000,000 representing Telex's research and development savings, even though "Telex did not complete its Merlin project"), *abrogation on other grounds by Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013); *Penalty Kick*, 318 F.3d at 1292 (reduction in research and development costs constitutes use). Genuine issues of material fact exist as to iControl's use of Fintech's alleged trade secrets and the extent thereof such that iControl's "substantial portion" argument fails.

iControl's argument that Fintech fatally relies only on circumstantial evidence of misappropriation, such as the similarity of the parties' software and the speed with which iControl developed its product, is without merit. Contrary to iControl's contention, Fintech has proffered direct evidence of misappropriation in Lopez's e-mail correspondence with Gilad Keren, iControl's Chief Technical Officer, and others (*see* doc. 90 at 6-9). Further, the Court declines iControl's invitation to find that Fintech's circumstantial evidence is insufficient to avoid summary judgment. The case iControl cites in support of this proposition, *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 22 F. Supp. 3d 1305, 1314 (N.D. Ga. 2014), *vacated on other grounds*, 11th Cir. 14-12502 (Feb. 2, 2015), is inapposite because it does not hold that circumstantial evidence is never sufficient to establish a claim, but instead holds that plaintiff did not specifically identify any circumstantial evidence, that the "circumstantial evidence" solely relied upon by that plaintiff was actually a generalization or characterization about the similarity of the parties' programs, and that this proffer was insufficient to support a dispute of facts and avoid summary judgment. In contrast, the evidence proffered by Fintech in the case at bar is sufficient to avoid summary judgment.

C.       *Florida Deceptive & Unfair Trade Practices Act (Count V)*

iControl argues that Fintech's FDUTPA claim is preempted by its FUTSA claim because the FDUPTA claim is based, in part, on the alleged misappropriation of trade secrets in violation of FUTSA and is not otherwise materially distinguishable (doc. 68 at 16).[5] FUTSA, by its own provisions, forecloses other tort actions or remedies. *New Lenox Indus., Inc. v. Fenton*, 510 F. Supp. 2d, 893, 908 (M.D. Fla. 2007). FUTSA states, in relevant part, that it "displace[s] conflicting tort, restitutory, and other law[s] of this state providing civil remedies for misappropriation of a trade secret" but does not affect other "civil remedies that are not based upon misappropriation of a trade secret." Fla. Stat. § 688.008. "Thus, as a general proposition other torts involving the same underlying factual allegations as a claim for trade secret misappropriation will be preempted by FUTSA." *New Lenox*, 510 F. Supp. 2d at 908 (citing *Am. Honda Motor Co. v. Motorcycle Info. Network, Inc.*, 390 F.Supp.2d 1170, 1180–81 (M.D.Fla.2005) (where "the allegations of trade secret misappropriation alone comprise the underlying wrong, only the FUTSA claim will survive the motion to dismiss")). Therefore, "in order to pursue claims for additional tort causes of action where there are claims for misappropriation of a trade secret, there must be material distinctions between the allegations comprising the additional torts and the allegations supporting the FUTSA claim." *Id.* (citing *Allegiance Healthcare Corp. v. Coleman*, 232 F.Supp.2d 1329, 1335–36 (S.D.Fla.2002)).

---

[5] Fintech alleges in its FDUPTA claim that the unfair methods of competition, unconscionable acts and practices, and unfair or deceptive acts in which iControl engaged include the misappropriation of trade secrets in violation of DTSA (Count I) and FUSTA (Count II) and the intentional interference with Fintech's advantageous business relationships in violation of common law (Count III - tortious interference with business relationships). The Court's recommendation that summary judgment be granted as to Count III, as discussed *infra* at §III.E.2., does not affect the Court's analysis here as to Count V or Fintech's ability to rely, in Count V, on the allegations made in Count III.

Accordingly, the question the Court must resolve is whether the FDUTPA claim as alleged in Count V and the FUTSA claim as alleged in Count II are materially distinct. The Court concludes that the claims are distinct. Fintech's FDUTPA claim alleges that iControl "engaged in the unfair methods of competition, unconscionable acts or practices, and unfair and deceptive acts or practices" (doc. 1 at ¶ 90). In addition to asserting misappropriation of trade secrets as a basis for its FDUTPA claim, Fintech asserts that iControl intentionally interfered with Fintech's advantageous business relationships by making "false and disparaging statements about Fintech's products, services and capabilities to Fintech's customers and prospective customers in order to persuade them to abandon Fintech and engage iControl to perform services for which they previously engaged Fintech or were considering engaging Fintech" (doc. 1 at ¶¶ 81, 91).  Fintech further alleges that iControl "caused and induced Lopez to breach his confidentiality obligations [to Fintech] by employing him to assist in developing systems nearly identical to the systems he developed or oversaw the development of at Fintech" (doc. 1 at ¶¶ 36, 40). These constitute material distinctions, at least material enough at this stage, between the FDUTPA claim and the FUTSA claim such that Count V of the Complaint is not preempted by Fintech's FUTSA claim. *See XTec, Inc. v. Hembree Consulting Servs., Inc.,* 183 F. Supp. 3d 1245, 1263 (S.D. Fla. 2016); *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1134, 1146-47 (M.D. Fla. 2007). As such, iControl's motion for summary judgment should be denied as to Count V.

> D.    *Defamation-Based Claims – Tortious Interference with Business Relationships (Counts III), Misleading Advertising (Count VI), Injurious Falsehood (Count VII - mislabeled VI), and Unfair Competition (Count VIII - mislabeled VII)*

iControl seeks summary judgment on Fintech's four claims that are based on alleged defamatory statements made by iControl about Fintech. iControl argues that these defamation-

17

based claims are barred by the statute of limitations, the single publication rule and because Fintech is unable to establish that it has been damaged by the statements (doc. 68 at 17). The alleged defamatory statements include the following: Fintech does not have data integrity or analytics; Fintech does not offer bi-directional data flow commerce; Fintech does not offer customers help with credit and discrepancy reconciliation; Fintech offers only a single solution; and because Fintech does not provide bi-directional data flow commerce, iControl was chosen to be a Board member of the Beer Industry Electronic Commerce Coalition (doc. 1 at ¶ 39).

### 1.    *Statute of Limitations*

The two-year statute of limitations dictates that the defamation-based claims are barred if the defamatory statements were published prior to January 25, 2015. iControl has established, and Fintech does not dispute, that a presentation to CVS containing some of the alleged defamatory statements was made or published in 2013 (doc. 90-1 at 45-57; doc. 68-4 at 115). Therefore, the statements made in that presentation that Fintech does not have data integrity or analytics and that Fintech does not offer customers help with credit and discrepancy reconciliation are barred by the statute of limitations and cannot be used by Fintech as a basis for their defamation-based claims. However, these are the only statements that iControl has shown to have been published prior to January 25, 2015, and Fintech has alleged other defamatory statements in support of these claims (see doc. 1 at ¶ 39). Accordingly, the statute of limitations bars the alleged false and disparaging statement that Fintech does not have data integrity or analytics (doc. 1 at ¶ 39(a)). Likewise, the statement that Fintech does not offer customers help with credit and discrepancy reconciliation (doc. 1 at ¶ 39(c)) is barred as a basis for Fintech's defamation-related claims. The claims themselves, however, are not barred by the statute of limitations.

### 2. *Single Publication Rule*

Under the single publication/single action rule, "[w]hen claims are based on analogous underlying facts and the causes of action are intended to compensate for the same alleged harm, a plaintiff may not proceed on multiple counts for what is essentially the same defamatory publication or event." *Klayman v. Judicial Watch, Inc.*, 22 F. Supp. 3d 1240, 1256 (S.D. Fla. 2014). iControl argues that Fintech's four defamation-based claims (and a portion of the FDUTPA claim) are all based on the same alleged defamatory statements and the identical operative facts and, therefore, are barred by the single publication rule (doc. 68 at 18). While Fintech does not allege a defamation claim per se, it alleges an analogous claim for injurious falsehood.[6] The Court agrees that these four counts as alleged are premised on the same facts and the same defamatory statements and cannot be viewed as viable independent tort claims. All four counts are based on the claim that "iControl knowingly made or caused to be made false and disparaging statements about Fintech's products, services, and capabilities…" (doc. 1 at ¶¶ 81, 98, 104 & 110). Fintech does not contest this characterization of its claims or proffer any evidence to the contrary. As such, Fintech should be allowed to proceed only with its injurious falsehood claim.[7]

---

[6] Florida courts have afforded identical treatment to injurious falsehood and defamation claims for purposes of the single action rule. *Callaway Land & Cattle Co., Inc. v. Banyon Lakes C. Corp.*, 831 So.2d 204, 209 (Fla. 4th DCA 2002)(concluding that a plaintiff in an action for injurious falsehood should be subject to the single action/single publication rule as is a plaintiff in a personal defamation claim).

[7] The Court notes that some Florida decisions contain language suggesting that the single action rule is only applicable to preclude other claims when the associated defamation claim fails. *See Callaway*, 831 So.2d at 208 ("The single publication/single action rule ... does not permit multiple actions when they arise from the same publication upon which a failed defamation claim is based."); *Ovadia v. Bloom*, 756 So.2d 137, 141 (Fla. 3d DCA 2000) ("the single publication/single action rule does not permit multiple actions to be maintained when they arise from the same publication upon which a failed defamation claim is based."). However, several federal district court cases in this circuit have held that non-defamation tort claims based on a defamatory statement are barred regardless of whether the related defamation claim fails. *See Kinsman v.*

In addition, Fintech fails to respond to iControl's single action rule argument, and it is, therefore, deemed unopposed. *See Local Access LLC v. T-Mobile USA, Inc.*, No. 6:17-cv-382-Orl-41TBS, 2017 WL 3118535, at *1 (M.D. Fla. July 21, 2017)("When a party fails to respond, that is an indication that the motion is unopposed.")(citing *Foster v. Coca–Cola Co.*, No. 6:14–cv–2102–Orl–40TBS, 2015 WL 3486008, at *1 (M.D. Fla. June 2, 2015)). Moreover, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995)(citing *Blue Cross & Blue Shield v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990)). "Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Id.* (citing *Road Sprinkler Fitters Local Union No. 669 v. Indep. Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir.1994)). Accordingly, Fintech's claim for injurious falsehood survives the single-action rule while its claims for tortious interference with business relationships, misleading advertising and

---

*Winston*, No. 6:15-cv-696-Orl-22GJK, 2015 WL 12839267, at *5 (M.D. Fla. Sept. 15, 2015)(discussing the apparent split in authority and applying the single action rule to dismiss a tortious interference count even though plaintiff was allowed to proceed with defamation claim); *Tobinick v. Novella*, No. 9:14-CV-80781, 2015 WL 328236, at *11 (S.D. Fla. Jan. 23, 2015)(electing to follow the rule that non-defamation tort claims based on a defamatory statement are barred regardless of whether the defamation claim fails); *Klayman*, 22 F. Supp. 3d at 1257 (determining that claims of tortious interference with contract and intentional infliction of emotional distress were barred under single action rule even though defamation count survived summary judgment); *Trujillo v. Banco Cent. Del Ecuador*, 17 F. Supp. 2d 1334, 1339–40 (S.D. Fla. 1998) (dismissing false light invasion of privacy claim based on single action rule even though defamation claims survived dismissal and summary judgment). The Court finds this latter body of case law persuasive because recovery for separate causes of action is proper when based on the existence of independent facts as compared to asserting different damages for the same injury. This Court, however, need not specifically reach this issue because Fintech's injurious falsehood claim ultimately fails, as discussed *infra* in §III.D.3.

unfair competition are barred by the single action rule, and summary judgment should be granted as to Counts III, VI and Count VIII (mislabeled VII).

### 3.    No Evidence of Damage

iControl asserts that Fintech's four defamation-based claims fail as a matter of law because there is no evidence that the alleged falsehoods damaged Fintech (doc. 68 at 19). The Court will only address this argument as to Fintech's claim for injurious falsehood as it recommends that summary judgment be granted as to the other three defamation-based claims pursuant to the single-action rule, but the analysis and finding of lack of evidence of damage applies equally to all four defamation-based claims.

Under Florida law, the elements of the tort of injurious falsehood are: (1) a falsehood; (2) published or communicated to a third party; (3) the defendant knew that the falsehood would likely induce others not to deal with the plaintiff; (4) the falsehood does play a material and substantial part in inducing others not to deal with the plaintiff; and (5) special damages. *Bothmann v. Harrington*, 458 So.2d 1163, 1168 (Fla. 3d DCA 1984). The "gist of the tort of injurious falsehood is the intentional interference with another's economic relations." *Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A.*, 742 So.2d 381, 386 (Fla. 4th DCA 1999). Damages for injurious falsehood are "restricted to [loss] which results *directly and immediately* from the falsehood's effect on the conduct of third persons and the expenses incurred to counteract the publication." *Bothmann*, 458 So.2d at 1170 (citing RESTATEMENT (SECOND) OF TORTS §633 (1977)).

iControl contends that Fintech offers no evidence of any damages associated with the alleged defamation, much less special damages. While Fintech contends that the testimony of Fintech's corporate representative, Glenn Jones, regarding the monthly revenue Fintech lost from

retailers that switched from Fintech to iControl is evidence of damage (doc. 90-10 at 115:16-119:15, discussing an analysis of known iControl business prepared by Ben Boehm, Fintech Vice President of Finance; doc. 90-10, Exh. 21), Fintech fails to establish that these retailers switched from Fintech to iControl because of the alleged defamatory statements made by iControl about Fintech. To the contrary, Jones admitted that customers leaving Fintech in favor of iControl stated they did so because iControl charges less than Fintech (doc. 15-1 at 37:14-40:24). It is uncontested that the Dave & Busters locations that switched from Fintech to iControl did so based on an alleged misrepresentation by iControl about the services that iControl could provide, not defamatory statements about Fintech (doc. 68-4 at 33:16-35:16). In fact, Fintech is unaware of false statements iControl made to Dave & Busters about Fintech (doc. 68-4 at 35:13-16). Similarly, the alleged misrepresentation by iControl about iControl offering a "no title to funds" feature does not involve any defamatory statements about Fintech (*see* doc. 90-10 at Exh. 11). Fintech fails to relate any defamatory statements made by iControl about Fintech to the alleged decline in invoices Fintech processed for distributors serving Big Red (*see* doc. 90 at 23; doc. 90-1 at 58-59 & 62-63). Jones's testimony that "[c]urrent and former customers of Fintech have advised Fintech that they engaged iControl because of false or misleading statements made by iControl" without identifying those customers and the statements made by iControl about Fintech to them is insufficient to survive summary judgment (doc. 31-4 at Interrogatory No. 11, Response No. 2; doc. 68-10 at Interrogatory No. 11, Response No. 2). Fintech bears the burden of proof at trial on this issue, and iControl has shown the Court that there is an absence of evidence to support Fintech's claim that the alleged falsehoods damaged Fintech. *Fitzpatrick*, 2 F.3d at 1115-16. As such, the burden shifts to Fintech to produce significant, probative evidence demonstrating a genuine issue for trial. *Tolan*, 134 S.

Ct. at 1863, 1866; *Fitzpatrick*, 2 F.3d at 1116-17.  Fintech has failed to produce such evidence.

Accordingly, summary judgment should be granted as to Count VII (mislabeled as Count VI).

### E.      Tortious Interference with a Contract (Count IV)

Fintech's tortious interference with a contract claim alleges that iControl was aware of Lopez's contractual obligations to Fintech and induced or otherwise caused Lopez to violate the terms of the subject Lopez employment agreements (doc. 1 at ¶¶ 85-86). iControl argues that Fintech's claim fails as a matter of law because the subject Lopez employment agreements were no longer in effect at the time of the alleged interference, and, even if they were, the Contractor Confidentiality Agreement does not specifically identify the allegedly misappropriated technical processes or software as Confidential Information (doc. 1-1). The Court finds iControl's arguments unpersuasive.

While the Court agrees that a claim for tortious interference fails where there is no enforceable contract, iControl has not established that the subject Lopez employment agreements are not enforceable contracts. The cases cited by iControl are not directly on point. In fact, a review of the cases cited by iControl offers propositions of contract law that work against iControl. For example, the appellate court in *Anarkali Boutique, Inc. v. Ortiz*, 104 So.3d 1202 (Fla. 4th DCA 2012), held that the trial court erred in not giving effect to the agreement's provision that "[a]ny subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement." *Id.* at 1205 (citing *Philip Morris, Inc. v. French*, 897 So.2d 480, 488 (Fla. 3d DCA 2004)("Courts are required to construe a contract as a whole and give effect, where possible, to every provision of the agreement.")). The appellate court also noted that "'[a] court shall construe a restrictive covenant in favor of providing reasonable protection to all legitimate

business interests established by the person seeking enforcement'" and "'A court shall not employ any rule of contract construction that requires the court to construe a restrictive covenant narrowly, against the restraint, or against the drafter of the contract.'" *Id.* (quoting § Fla. Stat. § 542.335(1)(h)). Therefore, because iControl has not pointed the Court to case law regarding contracts that expressly provide that the confidentiality provisions survive the termination of the contract, the Court is not convinced that the confidentiality provisions found in the subject agreements cannot be enforced. Similarly, iControl has failed to cite any case law in support of its argument that the language of the confidentiality provisions in the subject Lopez employment agreements cannot be interpreted to include technical processes or software within the categories expressly enumerated. Accordingly, summary judgment should be denied as to Count IV.

> ### F.   Injunction

Finally, iControl contends that Fintech is not entitled to an injunction because its four year delay in bringing suit demonstrates there is no irreparable harm (doc. 68 at 25).[8]  iControl cites *Menudo International, LLC v. In Miami Production, LLC*, No. 17-21559-Civ-TORRES, 2017 WL 4919222 (S.D. Fla. Oct. 31, 2017), in support of this argument. The issue addressed by the Court in *Menudo*, however, was the timing or delay in relation to a motion for preliminary injunction, not a permanent injunction as is sought in this case. Preliminary injunctions and permanent injunctions require different elements and provide different forms of relief. *See Lermer Germany GmbH v. Lermer Corp.*, 94 F.3d 1575, 1577 (Fed. Cir. 1996). iControl's argument that the delay belies irreparable harm is without merit in the context of a permanent injunction. While irreparable harm can be relevant for establishing the unavailability of an adequate remedy at law required for

---

[8] iControl contends that Fintech was aware of iControl's alleged misappropriation in 2013, but did not sue seeking injunctive relief against iControl until 2017 (doc. 68 at 25).

a permanent injunction, Fintech's delay in filing suit becomes irrelevant in this context and likewise does not speak to the question of Fintech's future harm if Fintech is successful in proving the merits of its claims. *See 800 Adept, Inc. v. Murex Sec., Ltd.*, 505 F. Supp. 2d 1327, 1335-37 (M.D. Fla. 2007), *aff'd in part, vacated in part & rev'd in part on other grounds*, 539 F.3d 1354 (Fed. Cir. 2008).  Even assuming delay in filing suit is relevant to a permanent injunction analysis, the alleged delay in this instance is not enough, in and of itself, to preclude a finding of irreparable harm and warrant summary judgment. Accordingly, summary judgment should be denied as to as to the injunctive relief sought by Fintech.

  *IV.*  *Conclusion*

  Based on the foregoing reasons, I recommend that iControl's Motion for Summary Judgment (doc. 68) be granted as to Fintech's claims of misappropriation of its customer list, regulatory map, no title to funds process and its analytic reports themselves as alleged in Count II; granted as to the alleged defamatory statements that Fintech does not have data integrity or analytics and that Fintech does not offer customers help with credit and discrepancy reconciliation as alleged in Count VII (mislabeled as VI); granted as to Counts III, VI, Count VII (mislabeled as VI) and Count VIII (mislabeled VII); and denied as to the remainder of the motion.

  IT IS SO RECOMMENDED in Tampa, Florida on June 12, 2018.

Mark a. Pizzo

MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE

25

## <u>NOTICE TO PARTIES</u>

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1.

26