**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**FINANCIAL INFORMATION**
**TECHNOLOGIES, LLC,**

      **Plaintiff,**

**v.**                               **CASE NO. 8:17-cv-00190-T-23MAP**

**ICONTROL SYSTEMS, USA, LLC,**

      **Defendant.**

_____/

**PLAINTIFF'S TRIAL BRIEF**

      Plaintiff Financial Information Technologies, LLC ("Fintech"), by and through its undersigned counsel and pursuant to Court's Case Management and Scheduling Order [Doc. 8], hereby files its Trial Brief.

**PRELIMINARY STATEMENT**

      Fintech has designed a suite of proprietary software systems that process electronic funds transfers ("EFT") between retailers and distributors or alcoholic beverages ("regulated commerce") and analyze and reconcile the payments and invoices to streamline business processes and ensure timely receipt of funds.  For decades, Fintech was the "dominant competitor"[1] in this market until 2013, when iControl Systems, USA, LLC ("iControl") began developing and marketing a competing software program by engaging the services of two former high-level employees of Fintech—Mark Lopez, Fintech's ex-Vice President of Operations, and

---

[1] [Doc. 121 at 1].

Andrew Sanderson, formerly a regional account executive—using Fintech's trade secrets and confidential, proprietary information, despite the fact that  each had executed a Confidentiality and Non-Compete Agreement ("Confidentiality Agreement") with Fintech which prohibited them from unauthorized use, disclosure, or retention of Fintech's confidential information, including all "proprietary information essential to the business and competitive position of the Company, including . . . information of any kind."  [Doc. 1-1 at ¶¶ 1, 2]; [Doc. S-90, P's Resp. in Opp'n to MSJ, Ex. C, Sanderson 10/07/2016 Depo: 31, 32, Ex. 2 at ¶¶ 1, 2]. Fintech's Employee Handbook contained similar provisions, as did a Consulting Agreement signed by Lopez.  [Doc. 1-2 at 3]; [Doc. S-90, P's Resp. in Opp'n to MSJ, Ex. A, Jones 12/15/2016 Depo: 120:2-121:13, Ex. 10 at PPLOP000041].  To market its new product, iControl made false statements to Fintech's current, former, and prospective customers to discourage them from doing business with Fintech.

Fintech has sued iControl for violation of (1) the Defend Trade Secrets Act of 2016 ("DTSA"), (2) the Florida Uniform Trade Secrets Act ("FUTSA"), and (3) the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), as well as (4) tortious interference in Fintech's non-disclosure agreements with current and former employees, customers, and vendors. Fintech alleges that iControl misappropriated the following trade secrets, detailed more fully in Ivan Zatkovich's Expert Report and Supplemental Expert Report:

- Fintech's regulatory compliant distributor electronic funds transfer ("DEFT") method;

- Fintech's no-cost distributor electronic funds transfer method;

- Elements of Fintech's Analytics, such as its data normalization technology and data analytics features;

- Elements of Fintech's data interfaces, such as its data exchange formats and data exchange conversion techniques;

- Elements of Fintech's User Portal, such as its invoice-editing features and on-line report access;

- Elements of the technology Fintech uses to generate reports for its customers, such as exception reporting, bank activity reports, and invoice detail reports;

- Customer information, including Fintech's pricing and customer-specific interfaces and file formats, customer needs and priorities, and customer contacts;

- Fintech's forms including the customer enrollment forms and disclosure forms;

- The creation of payment files sent to Fintech's partner banks for retransmission to NACHA to effect the debits of the retailers to the distributors;

- Fintech's Electronic Data Interface ("EDI") process; outbound maps; outbound remittance files; database structure; proprietary file processing techniques; proprietary data cleansing techniques; techniques for debiting delivery fees, split cases, and taxes; technique for handling header

adjustments; techniques for handling debit filters; rounding techniques; and method of handling and reconciling vendor item numbers ("VINs") and retailers' item numbers.

## A.   ELEMENTS OF FINTECH'S CLAIMS

### 1.   Misappropriation of Trade Secrets

The elements of a claim under DTSA and FUTSA are identical.[2] Each statute prohibits the misappropriation of trade secrets.   "[A] trade secret consists of information that (1) derives economic value from not being readily ascertainable by others and (2) is the subject of reasonable efforts to maintain its secrecy." *Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998) (*citing* Fla. Stat. § 688.002(4)) (defining "trade secret" under FUTSA); *see also* 18 U.S.C. § 1839(3) (defining "trade secret" under DTSA).

"Misappropriation" means:

(a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(b) Disclosure or use of a trade secret of another without express or implied consent by a person who:

   1. Used improper means to acquire knowledge of the trade secret; or

   2. At the time of disclosure or use, knew or had reason to know that her or his knowledge of the trade secret was:

      a. Derived from or through a person who had utilized improper means to acquire it;

---

[2] The only difference between them is that, under the DTSA, the trade secrets must relate to interstate commerce. The evidence at trial will meet this element.

   b. Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

   c. Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

  3. Before a material change of her or his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

*Fla. Stat.* § 688.002 (FUTSA); *see also* 18 U.S.C. § 1839 (DTSA); *Del Monte Fresh Produce Co. v. Dole Food Co.*, 136 F. Supp. 2d 1271, 1291 (S.D. Fla. 2001) (listing some of the elements for a claim under FUTSA).  "Improper means" includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  *Fla. Stat.* § 688.002 (FUTSA); *see also* 18 U.S.C. § 1839 (DTSA).

  Under the FUTSA and the DTSA, an action for misappropriation must be brought within three years after the misappropriation "is discovered or by the exercise of reasonable diligence should have been discovered."  § 688.007, *Fla. Stat.* (2017); 18 U.S.C. § 1836(d) (2017).  Fintech filed its Complaint against iControl on January 25, 2017, so its misappropriation claims are timely if the misappropriation occurred, or should reasonably have been discovered, on or after January 25, 2014.

  iControl has the burden of showing untimeliness.   Mere concerns or suspicions of misappropriation are not enough to start the clock running on the statute of limitations where, as here, a plaintiff was not in a position to confirm them.

*Knights Armament Co. v. Optical Sys. Tech., Inc.*, 636 F. Supp. 2d 1283, 1293 (M.D. Fla. 2009) (mere suspicion of misappropriation does not start the clock running), *aff'd*, 654 F.3d 1179 (11th Cir. 2011); *Telex Corp. v. Int'l Bus. Machines Corp.*, 510 F.2d 894, 912 (10th Cir. 1975) (trial court properly "held that [statute of limitations] did not apply because Telex had fraudulently concealed the fact that they had misappropriated IBM's trade secrets."); *Intermedics, Inc. v. Ventritex, Inc.*, 775 F. Supp. 1258, 1266 (N.D. Cal. 1991) ("[a]nd while plaintiff believed that defendants would be compelled to use plaintiff's secrets to accomplish the product goals defendants had set, plaintiff was not in a position to eliminate the possibility that defendants could achieve their ends in some other way").

Fintech did not know, and should not reasonably have known, that iControl misappropriated Fintech's trade secrets until on or after January 25, 2014.  iControl concealed Lopez's services as an independent contractor from 2013 to 2015. iControl had only one regulated commerce customer until 2014, and the relationship with that customer was a pilot program on the way to commercial viability.  As of December of 2013, iControl was still at the proof of concept stage, and it was not until 2015 that iControl's regulated commerce division released most of its infringing product features.

### 2.    FDUTPA

Fintech sues under FDUTPA for (1) theft of its trade secrets, (2) theft of its non-trade secret confidential information, and (3) false and misleading statements that iControl made to Fintech's current, former, and prospective customers to

discourage them from doing business with Fintech.  In order to assert a claim for damages under FDUTPA, the plaintiff must establish:  "(1) a deceptive act or unfair practice; (2) causation; and (3) actual damages."  *Baptist Hosp., Inc. v. Baker*, 84 So. 3d 1200, 1204 (Fla. 1st DCA 2012) (internal citations omitted); *see also Fla. Stat.* § 501.204(1) (2016).  Under the FDUTPA, "[a]n unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."  *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003) (internal quotation marks and citations omitted).  "[D]eception occurs if there is a 'representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment.'"  *Id.* (*quoting Millennium Commc'ns & Fulfillment, Inc. v. Office of Attorney Gen., Dep't of Legal Affairs, State of Fla.*, 761 So. 2d 1256, 1263 (Fla. 3d DCA 2000)).  Courts apply a "broad reading" when determining what kind of misconduct qualifies for relief under FDUTPA.  *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1134, 1146–47 (M.D. Fla. 2007)

iControl sought summary judgment on the ground that Fintech's FDUTPA claim is barred to the extent it is "based on the same underlying factual allegations as the claim for relief under the FUTSA."  [Doc. 68 at 16, 17] (*citing Fla. Stat.* § 688.008(1) (2017)).  The Report and Recommendation on summary judgment rejected that argument because there are additional facts beyond mere misappropriation, such as the fact that iControl sought out (and concealed its efforts) to engage the plaintiff's former employees in order to obtain the trade secrets at

issue.  "Such assertions are sufficient to materially distinguish [plaintiff]'s FDUTPA claim from the FUTSA claim."  *See, e.g. XTec, Inc. v. Hembree Consulting Servs., Inc.*, 183 F. Supp. 3d 1245, 1263 (S.D. Fla. 2016) (FDUTPA claim was not preempted by FUTSA where plaintiff alleged defendant solicited one of plaintiff's former contractors "for the purpose of using [its] knowledge of [plaintiff's] proprietary trade secrets to create a competing product," and the contractor obtained the trade secrets deceptively, "under the guise of routine training"); *Furmanite Am., Inc.*, 506 F. Supp. 2d at 1146–47 (defendant's "hir[ing] away [plaintiff's employees] *en masse* and use them to misappropriate [Plaintiff]'s trade secrets would constitute unlawful and unfair or deceptive acts or practices under the broad reading Florida courts traditionally apply to FDUTPA").

Fintech also sues under FDUTPA to redress iControl's misappropriation of its proprietary, confidential information to the extent the information does not qualify as trade secrets.  FDUTPA prohibits the unauthorized use or disclosure of non-trade secret confidential information.  *See, e.g. Sensormatic Elecs. Corp. v. TAG Co. US, LLC*, 632 F. Supp. 1147, 1192, 1193, ¶¶ 340-343 (S.D. Fla. 2008) (disclosure of "non-trade secret confidential information" qualified as "unfair methods of competition" under the statute); *see also Procaps S.A. v. Patheon Inc.*, 36 F. Supp. 3d 1306, 1331 (S.D. Fla. 2014) (same).

### 3.    Tortious Interference with Contracts

Fintech alleges that iControl tortuously interfered in Fintech's non-disclosure agreements with current and former employees, customers, and vendors.  To state a

claim for tortious interference with a contractual relationship under Florida law, a plaintiff must allege:  "(1) the existence of an enforceable contract, (2) the defendant's knowledge of that contract, (3) an intentional and unjustified interference by the defendant with the plaintiff's rights under the contract, and (4) resulting damages." *Ace Pro Sound & Recording, LLC v. Albertson*, 512 F. Supp. 2d 1259, 1268 (S.D. Fla. 2007) (*quoting Mariscotti v. Merco Grp. At Akoya, Inc.*, 917 So. 2d 890, 892 (Fla. 3d DCA 2005)).

**B.    DAMAGES**

**1.    Tortious Interference with Contracts**

For iControl's tortious interference with Fintech's contracts, Fintech will seek to recover lost profits/revenues and punitive damages and disgorge iControl's unjust gains, in an amount to be determined by the jury.   In order to demonstrate entitlement to punitive damages, Fintech must show by clear and convincing evidence that iControl was "personally guilty of intentional misconduct," which "means that the defendant had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to the claimant would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in injury or damage." *Fla. Stat.* § 768.72(2); *see also Bistline v. Rogers*, 215 So. 3d 607, 609 (Fla. 4th DCA 2017) (describing standard for punitive damages in an intentional interference case).

Punitive damages under Florida law are capped at the greater of (1) three times the amount of compensatory damages or (2) $500,000.   *Fla. Stat.* §

768.73(1)(a). However, if Fintech shows that iControl "was motivated solely by unreasonable financial gain and . . . the high likelihood of injury resulting from the conduct, was actually known" by iControl, then punitive damages are capped at the greater of (1) four times the amount of compensatory damages or (2) $2 million. Fla. Stat. § 768.73(1)(b). Alternatively, if Fintech shows that iControl "had a specific intent to harm [Fintech] and . . . [iControl]'s conduct did in fact harm [Fintech]," then "there shall be no cap on punitive damages." *Fla. Stat.* § 768.73(1)(c).

### 2.   FDUTPA

Under FDUTPA, Fintech will seek to recover "actual damages" in an amount determined by the jury. Fla. Stat. § 501.211(1). Fintech will also seek to recover its attorneys' fees as determined by the Court. Fla. *Id.*

### 3.   DTSA and FUTSA

Under the DTSA and FUTSA, Fintech will seek to recover its lost profits/revenue due to iControl's misappropriation of trade secrets, and any unjust enrichment of iControl that is not addressed in computing damages for lost profits/revenue, in an amount to be determined by the jury. 18 U.S.C. § 1836(3)(B)(i); *Fla. Stat.* § 688.004(1). Alternatively, Fintech may recover "a reasonable royalty for [iControl]'s unauthorized disclosure or use of the trade secret[s]." 18 U.S.C. § 1836(3)(B)(ii); *Fla. Stat.* § 688.004(1).

"Damages need not be proved with great specificity. A flexible approach is applied to the calculation of damages in a misappropriation of trade secrets case." *In re Mandel*, 578 F. App'x. 376, 390 (5th Cir. 2014); *see also Computer Assocs.*

*Int'l, Inc. v. Am. Fundware, Inc.*, 831 F. Supp. 1516, 1526 (D. Colo. 1993) ("The proper measure of damages for misappropriation of trade secrets case can be elusive, and courts are encouraged to be flexible and imaginative.") (internal quotations omitted).   Florida courts have approved of a "liberal" standard when evaluating damages in a misappropriation case.   *See Perdue Farms Inc. v. Hook*, 777 So. 2d 1047, 1052 (Fla. 2d DCA 2001) ("The plaintiff fulfills its burden of proving damages by showing the misappropriation, the subsequent commercial use, and introduces evidence by which the jury can value the rights the defendant has obtained.") (internal quotation omitted); *see also Premier Labs*, 94 So. 3d at 644 (same).

A plaintiff's recovery for misappropriation of trade secrets can be measured by the loss to the plaintiff, the gain to the defendant, or a combination of both to the extent they do not overlap. RESTATEMENT (THIRD) OF UNFAIR COMPETITION, § 45, cmt. c & Reporter's Notes to cmt. c (1995) (collecting cases).   Courts have calculated the loss to the plaintiff in various ways, such as by determining "lost market share" or the "[l]ost profits on sales that would have been made by the plaintiff but for the appropriation" or by "applying the plaintiff's profit margin to the sales made by the defendant." *Id.*, § 45, Reporter's Notes to cmt. d (collecting cases); *see also Premier Lab Supply, Inc. v. Chemplex Indus., Inc.*, 94 So. 3d 640, 645–46 (Fla. 4th DCA 2012) ("In the present case, the trial court defined 'actual loss' as 'loss of profits, lost customers or lost market share to the owner of the trade secret caused by the misappropriation.'   We do not find any abuse of discretion in this definition").   The

loss of future profits may also be compensable.  *Id.* (*citing Financial Programs, Inc. v. Falcon Financial Services, Inc.*, 371 F. Supp. 770 (D. Or. 1974) (future profits on diverted accounts calculated on the basis of past experience); *Dozor Agency, Inc. v. Rosenberg*, 218 A.2d 583 (Pa. 1966) (loss of future premiums calculated on the basis of past experience)).  The plaintiff may also recover for "damages reflecting the reduced price received for its own goods as a result of competition attributable to the defendant's appropriation . . . ."  *Id.* (*citing Julius Hyman & Co. v. Velsicol Corp.*, 233 P.2d 977 (Colo. 1951), *cert. denied* 342 U.S. 870 (1951)).

In the instant case, Fintech will prove that its lost profits are essentially equal to its lost revenues because the marginal cost to Fintech of processing a payment between an alcohol retailer and distributor is virtually zero.  This is a common phenomenon in the IT industry.  Circuit Judge Richard Posner has explained that "[i]ntellectual property is characterized by heavy fixed costs relative to marginal costs. It is expensive to create but once created the cost of making additional copies is low, dramatically so in the case of software, where it is only a slight overstatement to speak of marginal cost as zero."  Richard A. Posner, "Antitrust in the New Economy", Speech Delivered at the ALI-ABA Conference (Sept. 14, 2000), *available at* http://www.techlawjournal.com/atr/20000914posner.as p#tljifn1.

To calculate the defendant's gains, courts often determine "the defendant's net profits from sales . . . incorporating the trade secret."  *Id.*, § 45, Reporter's Notes on cmt. f (*citing Jet Spray Cooler, Inc. v. Crampton*, 385 N.E.2d 1349 (1979)).  "The

plaintiff bears the burden of establishing sales; the defendant has the burden of establishing deductible expenses and any sales no attributable to the use of the trade secret." *Id.* (*citing USM Corp. v. Marson Fastener Corp.*, 467 N.E.2d 1271 (Mass. 1984); *Julius Hyman & Co.*, 233 P.2d 977).

Even if the jury finds that iControl did not incorporate some or all of the misappropriated trade secrets into its final product, Fintech may recover for iControl's reduction in research and development costs. *See, e.g. Telex Corp. v. Int'l Bus. Machines Corp.*, 510 F.2d 894, 911 n.10, 932 (10th Cir. 1975) (where it took IBM Corp. six years and $30,000,000 to develop the "Merlin project," and Telex Corp., "through the use of IBM trade secrets," was able to get more than halfway through its development of an equivalent technology in just eighteen months, the jury reasonably awarded IBM $10,000,000 representing Telex's research and development savings, even though "Telex did not complete its Merlin project"), *abrogation on other grounds  by Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1072 (10th Cir. 2013); *Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1292 (11th Cir. 2003) (reduction in R&D costs constitutes use) (*quoting* RESTATEMENT (3D) OF UNFAIR COMPETITION § 40, cmt. c.).

In addition, because iControl's misappropriation was willful and malicious, both the DTSA and FUTSA each entitle Fintech to exemplary damages equal to double the damages calculated under the previous methods, for a total of four times compensatory damages.   18 U.S.C. § 1836(3)(C), (D); *Fla. Stat.* §§ 688.004(2); 688.005.   The willfulness and maliciousness of iControl's misconduct also entitle

13

Fintech to recover reasonable attorneys' fees as determined by the Court. 18 U.S.C. § 1836(3)(C), (D); Fla. Stat. §§ 688.004(2); 688.005.

Fintech anticipates that iControl will argue that Fintech is not entitled to exemplary damages under the DTSA because Fintech did not include, in Lopez or Sanderson's non-disclosure agreements, certain notices required by 18 U.S.C. § 1833(b)(3)(C), which are generally a precondition for receiving exemplary damages under the DTSA. However, the DTSA carves out an exception where, as here, the non-disclosure agreements at issue were drafted before the DTSA's enactment. Specifically, 18 U.S.C. § 1833(b)(3)(D) states, "This paragraph [setting forth the notice requirements] shall apply to contracts and agreements that are entered into or updated *after* the date of enactment of this subsection." (emphasis added).

## C. INJUNCTIVE RELIEF AND PAYMENT OF A REASONABLE ROYALTY UNDER FUTSA AND DTSA

As well as damages for iControl's past misappropriation of trade secrets, Fintech will also seek a permanent injunction prohibiting iControl from further operation in the regulated commerce business. *Fla. Stat.* § 688.003 ("Actual or threatened misappropriation may be enjoined," and "[i]n appropriate circumstances, affirmative acts to protect a trade secret may be compelled by court order"); 18 U.S.C. § 1836(b)(3)(A) (same); RESTATEMENT (THIRD) OF UNFAIR COMPETITION, § 44, cmt. b & Reporter's Notes to cmt. b (1995) ("In many trade secret cases, both injunctive and monetary relief are appropriate: monetary relief to compensate the plaintiff for existing losses and injunctive relief to prevent future loss through further

use or disclosure of the trade secret.").[3] The elements required to show entitlement to a permanent injunction are as follows:   (1) The plaintiff "has suffered an irreparable injury; (2) th[e] remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) . . . considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) . . . the public interest would not be disserved by a permanent injunction."   *800 Adept, Inc. v. Murex Sec., Ltd.*, 505 F. Supp. 2d 1327, 1335 (M.D. Fla. 2007), *aff'd in part, vacated in part, rev'd in part on other grounds*, 539 F.3d 1354 (Fed. Cir. 2008).

"[I]njunctive relief is routinely granted in trade secret cases" because of "[t]he inadequacy of monetary relief and the risk of a destruction of trade secret rights through public disclosure." RESTATEMENT (THIRD) OF UNFAIR COMPETITION, § 44, cmt. c & Reporter's Notes on cmts. b & g (1995) (collecting cases).   The Restatement (Third) of Unfair Competition (hereinafter "Restatement") explains:

> Injunctive relief is often appropriate in trade secret cases to insure against additional harm from further unauthorized use of the trade secret and to deprive the defendant of additional benefits from the appropriation.   If the information has not become generally known, an injunction may also be appropriate to preserve the plaintiff's rights in the trade secret by preventing a public disclosure.   If the trade secret

---

[3] *See also Sensormatic Elecs. Corp. v. TAG Co. US, LLC*, 632 F. Supp. 2d 1147, 1187 (S.D. Fla. 2008) (plaintiff manufacturer was entitled to permanent injunction under FUTSA prohibiting rival manufacturer from using or disclosing plaintiff's manufacturing specifications because future disclosure or use of the specifications would cause irreparable injury); *Delucca v. GGL Indus., Inc.*, 712 So. 2d 1186, 1187 (Fla. 4th DCA 1998) (upholding permanent injunction under FUTSA prohibiting employee from disclosing former employer's trade secrets, consisting of tax returns, documents reflecting income, customers' names and addresses, etc., despite the employee's testimony that he was "no longer employed and ha[d] destroyed all evidence which he had in his possession," reasoning that "the trial court may well have found [that testimony was] not . . . credible"); *Thomas v. Alloy Fasteners, Inc.*, 664 So. 2d 59, 60 (Fla. 5th DCA 1995) (employer was entitled to permanent injunction under FUTSA against use of confidential information about employer's pricing and profit structure contained in "order edit lists" that were misappropriated by former employee).

15

has already entered the public domain, an injunction may be appropriate to remedy any head start or other unfair advantage acquired by the defendant as a result of the appropriation.

*Id.*, cmt. c. The Restatement lists the following "primary factors" as relevant in determining the appropriateness and scope of injunctive relief:

> (a) the nature of the interest to be protected;
> (b) the nature and extent of the appropriation;
> (c) the relative adequacy to the plaintiff of an injunction and of other remedies;
> (d) the relative harm likely to result to the legitimate interests of the defendant if an injunction is granted and to the legitimate interests of the plaintiff if an injunction is denied;
> (e) the interests of third persons and of the public;
> (f) any unreasonable delay by the plaintiff in bringing suit or otherwise asserting its rights;
> (g) any related misconduct on the part of the plaintiff; and
> (h) the practicality of framing and enforcing the injunction.

*Id.*, § 44.

In the instant case, Fintech will seek an injunction prohibiting iControl from doing business in the regulated commerce industry.   "An injunction against participation in a particular project or business" is appropriate where, as here, "an injunction limited to [use or disclosure of] the trade secret and its derivatives may be impossible to enforce due to the difficulty of distinguishing further improper use or disclosure of the trade secret from independent discovery," or where, as here, "the trade secret is an essential component of a larger process or product, other aspects of which are in the public domain," or where "the exact boundaries of the trade secret may be difficult to define."  *Id.*, § 44, cmt. d., *see also* Reporter's Notes to cmt. d (*citing General Electric Co. v. Sung*, 843 F.Supp. 776 (D. Mass. 1994) (injunction prohibiting manufacture of a product "inextricably connected" to the trade secret);

*Head Ski Co. v. Kam Ski Co.*, 158 F.Supp. 919 (D. Md. 1958); *ILG Industries, Inc. v. Scott*, 49 Ill.2d 88, 273 N.E. 2d 393 (1971) (prohibiting manufacture of a product in which the trade secret was an essential component)). The evidence at trial will support application of these principles.

The injunction should be unlimited in geographic scope. The Restatement explains:

> Geographic limitations on the scope of injunctive relief in trade secret cases are ordinarily inappropriate.  A defendant will normally be enjoined from disclosing or using the trade secret even outside the geographic market of the trade secret owner.  The defendant's use of the secret in any market may increase the risk of disclosure to the public and may deprive the plaintiff of potential licensing revenues. Even when direct injury to the plaintiff is unlikely, an injunction unlimited in geographic scope is ordinarily appropriate to deprive the defendant of further unjust enrichment from the appropriation of the trade secret.

RESTATEMENT (THIRD) OF UNFAIR COMPETITION, § 44, cmt. d & Reporter's Note to cmt. d (1995) (*citing Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970 (9th Cir. 1991) (world-wide injunction issued despite plaintiff's sales in only a few countries)).

The injunction should also be unlimited in temporal scope.  The burden should be on iControl to "seek a modification of the injunction when the commercial advantage from appropriation has ended."  RESTATEMENT (THIRD) OF UNFAIR COMPETITION, § 44, Reporter's Notes to cmt. f (1995) (*citing e.g.*, *Lamb-Weston*, 941 F.2d 970 (recognizing that under the Uniform Trade Secrets Act a defendant may ask the court to vacate an injunction if the trade secret becomes publicly known); *American Can Co. v. Mansukhani*, 814 F.2d 421 (7th Cir. 1987) (permitting the defendant to request a modification of the injunction if the trade secret enters the

public domain); *Curtiss-Wright Corp. v. Edel-Brown Tool & Die Co.*, 381 Mass. 1, 407 N.E.2d 319 (1980) (perpetual injunction affirmed on conflicting evidence of ability to reverse engineer, but recognizing the right of the defendant to seek a dissolution of the injunction based on changed circumstances); *Hyde Corp. v. Huffines*, 158 Tex. 566, 314 S.W.2d 763, *cert. denied* 358 U.S. 898 (1958) (defendant has the burden of persuading the court that the injunction should be less than perpetual . . .)).

Even if iControl later requests modification of the injunction and shows that the trade secrets at issue have entered the public domain or that iControl legitimately reverse-engineered them, the Court should deny the request for modification, on punitive grounds. RESTATEMENT (THIRD) OF UNFAIR COMPETITION, § 44, Reporter's Notes to cmt. c (1995) ("Some cases have granted punitive injunctions that go beyond protecting the inured party or preventing unjust enrichment) (*citing Franke v. Wiltschek*, 209 F.2d 493 (2d Cir. 1953) (injunction granted although the trade secret was largely disclosed in an expired patent); *Valco Cincinnati, Inc. v. N & D Machining Service, Inc.*, 24 Ohio St.3d 41, 492 N.E.2d 814 (1986) (upholding a perpetual injunction in order to punish the defendant in light of egregious circumstances); *Analogic Corp. v. Data Translation, Inc.*, 371 Mass. 643, 358 N.E.2d 804 (1976)).

Fintech anticipates that iControl will argue, *inter alia*, that an injunction is inappropriate because iControl in good faith made a substantial investment in developing its regulated commerce technology before it realized that its use of

Fintech's trade secrets was wrongful.[4]  Even if that were true (and it is not), such facts would not allow iControl to escape an injunction. Instead, in such situations, FUTSA and the DTSA allow the Court to condition future use of Fintech's trade secrets upon payment of a reasonable royalty therefor.  *See* Fla. Stat. § 688.003(2) (authorizing the Court to order payment of a reasonable royalty in "exceptional circumstances," such as where the defendant suffered "a material and prejudicial change of position prior to acquiring knowledge or reason to know of misappropriation"); 18 U.S.C. § 1836(b)(3)(A)(iii) (same).   The Restatement identifies two additional situations in which payment of a reasonable royalty may be an appropriate remedy:  (1) "[W]hen the plaintiff's loss, although difficult to measure is apparently greater than any gain acquired by the defendant," and (2) "in cases in which the defendant's gain from the trade secret is difficult to measure but apparently exceeds the plaintiff's loss." *Id.*, cmt. g.

The "royalty for the defendant's use may measure either the defendant's savings or the plaintiff's lost revenue." RESTATEMENT (THIRD) OF UNFAIR COMPETITION, § 45, cmt. c (1995). Elaborating, the Restatement provides:

> In determining the amount of a reasonable royalty, the courts have considered a variety of factors including the nature and importance of the trade secret, the nature and extent of the defendant's use, royalties discussed by the parties or common in the industry, resulting or foreseeable changes in the competitive position of the parties, the development costs of the plaintiff, the availability of alternatives to the trade secret, and other factors that might affect an agreement between willing buyers and sellers.

---

[4] This argument was waived because iControl did not assert it as an affirmative defense.  [Doc. 6].

RESTATEMENT (THIRD) OF UNFAIR COMPETITION, § 45, Reporter's Notes to cmt. g (1995) (collecting cases).

## D.   FINTECH'S CHIEF FINANCIAL OFFICER CAN TESTIFY REGARDING FINTECH'S DAMAGES

Fintech plans to call its Chief Financial Officer ("CFO"), Buck Jones, to testify as to Fintech's damages. Fintech anticipates that iControl will object that Jones's testimony constitutes expert opinion and is therefore inadmissible because Fintech did not disclose or designate Jones as an expert.  That argument should be rejected.

First, Jones will not testify based no his opinions; he will testify to facts based on his personal knowledge. Federal Rule of Evidence 602 (Need for Personal Knowledge) reads:

> A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.   Evidence to prove personal knowledge may consist of the witness's own testimony.  This rule does not apply to a witness's expert testimony under Rule 703.

Jones will identify customers switched from Fintech to iControl in whole or in part, and customers began using iControl that had never used Fintech before.  He will explain how he calculated the decline in invoices and revenue from these customers. *Cf., e.g.*, *Cox v. Glanz*, 2014 WL 916646, at *2 (N.D. Okla. Mar. 10, 2014) (In § 1983 action, denying motion in limine to exclude as opinion the testimony of jail nurses on "policies, practices, and procedures" of the jail, reasoning that the nurses appeared to be fact witnesses whose testimony would not be based on specialized knowledge); *Howard Bros. v. Sotuyo*, 472 So. 2d 1264, 1265 (Fla. 1st

DCA 1985) (in police officer's slip-and-fall negligence action, officer's supervisor's testimony that officer's injuries disqualified him from the patrol division was properly admitted as factual and not opinion testimony where the testimony was based on personal knowledge, as the supervisor was the police department's collective bargaining representative, was familiar with the department's job description for police officers, and had been a patrolman for sixteen years).

Even if Jones' testimony is characterized as opinion, it will be admissible as opinion testimony by a lay witness pursuant to Federal Rule of Evidence 701. In 2000, the rule was amended to add subsection (c). It reads:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a) rationally based on the witness's perception;
>
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

The comments to the 2000 Amendment are relevant and often cited:

> For example, most courts have permitted the owner or officer of a business to testify to the value or projected profits of the business, without the necessity of qualifying the witness as an accountant, appraiser, or similar expert. See, e.g., *Lightning Lube, Inc. v. Witco Corp.* 4 F.3d 1153 (3d Cir. 1993) (no abuse of discretion in permitting the plaintiff's owner to give lay opinion testimony as to damages, as it was based on his knowledge and participation in the day-to-day affairs of the business). Such opinion testimony is admitted not because of experience, training or specialized knowledge within the realm of an expert, but because of the particularized knowledge that the witness has by virtue of his or her position in the business. The amendment does not purport to change this analysis.

Courts regularly allow officers of a business to offer testimony about lost profits. *See, e.g. Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co., Ltd.*, 320 F.3d 1213, 1222 (11th Cir. 2003) ("Reading these two comments together, it would appear that opinion testimony by business owners and officers is one of the prototypical areas intended to remain undisturbed."); *Mortg. Now, Inc. v. Stone*, 2010 WL 11519632, at *2 (N.D. Fla. Sept. 29, 2010) ("The court finds that the testimony of Marchese and Perry as officers of Mortgage Now is precisely the type of opinion testimony contemplated by the above advisory committee's note to Rule 701.  Thus, Marchese and Perry, as CEO and CFO respectively of Mortgage Now, will be permitted to provide lay opinion testimony at trial pursuant to Federal Rule of Evidence 701 regarding the damages Mortgage Now allegedly sustained without the necessity of qualifying either witness as an accountant, appraiser or similar expert, provided a sufficient foundation for the testimony can be laid.").

E.     **ICONTROL'S UNENFORCEABILITY ARGUMENT**

iControl argues that its interference in Lopez's non-disclosure agreement with Fintech ("Agreement") is not actionable because the Agreement is unenforceable. Specifically, iControl argues, that "the . . . Agreement is unenforceable as contrary to Florida law [because] it purports to protect information 'notwithstanding that some or all of the Confidential Information 'shall have become publicly disclosed or outdated.'"   [Doc. 68 at 24, 25].   iControl has also unilaterally listed, as an outstanding issue of fact in the Joint Pretrial Statement, "[w]hether the restrictive

covenants in the Agreements are void and unenforceable." [Doc. 115, § X, ¶ 13]. However, this is a nonissue, as the Florida Supreme Court held in *United Yacht Brokers, Inc. v. Gillespie*, 377 So. 2d 668, 672 (Fla. 1979) that unenforceable contracts may sustain an action for tortious interference.

In that case, United Yacht Brokers, Inc. ("United"), entered into an oral agreement with Keith Johnson to assist Johnson in buying a yacht, in exchange for a commission for its efforts. On Johnson's behalf, United negotiated a purchase agreement for a yacht, but Johnson was subsequently induced to disintermediate United and purchase the yacht directly from the owners. When Johnson refused to pay United a commission on the sale, United sued the yacht's original owners for tortiously interfering with United's oral brokerage agreement with Johnson. The trial court granted the owners' motion for summary judgment, reasoning that the oral brokerage agreement was "void and thus unenforceable" for failure to comply with Section 537.05(2), *Florida Statutes*, which "requires licensed yacht brokers to procure written authorization from the principal before acting on behalf of the principal."

The Florida Supreme Court reversed, holding that a claim for tortious interference with a contract will lie regardless of whether the underlying contract is enforceable. The court reasoned:

> The agreement need not, however, be enforceable by the plaintiff as a contract. . . . The law of course does not object to the voluntary performance of agreements merely because it will not enforce them, and it indulges in the assumption that even unenforceable promises will be carried out if no third person interferes. Accordingly, it usually is held that contracts which are voidable by reason of the statute of

23

> frauds, formal defects, lack of consideration, lack of mutuality, or even uncertainty of terms, or harsh and unconscionable provisions, or conditions precedent to the existence of the obligation, can still afford a basis for a tort action when the defendant interferes with their performance.

*Id.* (*quoting Allen v. Leybourne*, 190 So.2d 825, 828 (Fla. 3d DCA 1966)).  The court explained that "[a]lthough we do not condone United's failure to comply with section 537.05(2), neither will we permit [the yacht's original owners] to use it as a shield to limit their liability for tortious interference . . . ."  *Id.*  Similarly, even if Fintech's Agreement with Lopez was unenforceable, that does not license iControl to intentionally interfere with the Agreement.

## F.   ICONTROL'S DEFENSE OF UNCLEAN HANDS

Throughout the instant case, iControl's counsel, over Plaintiff's counsel's objections, has repeatedly asked deponents about whether Fintech's Chief Executive Officer, Scott Riley, has made inappropriate racist, sexist, or profane comments. iControl argues that these issues are relevant to its defense of unclean hands, which iControl pled as follows:

> The Plaintiff's claims for equitable relief are barred by the doctrine of unclean hands to the extent the Plaintiff made false and defamatory statements about [iControl/Sanderson or his employer] *and to the extent that the Plaintiff permitted a work environment contrary to lawful and appropriate employment practices.*

[Doc. 6].  (emphasis added).

However, the "unclean hands" affirmative defense does not justify opposing counsel's inappropriate questions in the context of defendant's theft of Fintech's confidential information.  "[F]or a party to successfully avail itself of the doctrine of

'unclean hands,' it must demonstrate that the other party's wrongdoing was [(1)] directly related to that party's claim and that [(2)] the asserting party was personally injured by that wrongdoing." *TEC Serv, LLC v. Crabb*, 2013 WL 12177335, at *6 (S.D. Fla. June 11, 2013) (*citing Calloway v. Partners Nat. Health Plans*, 986 F. 2d 446, 450-51 (11th Cir. 1993)).  Neither of these elements is met on the facts as pled.

As to the first element, even if Riley's alleged comments were sufficiently severe and pervasive to rise to the level of a hostile work environment (and there is no intimation that they were), and even if the alleged hostility were related to Lopez and Sanderson's protected characteristic(s) (which it is not), this would not give rise to unclean hands because Lopez and Sanderson's resultant claims for discrimination would be in no way related to Plaintiff's actions for theft of its proprietary information.  *See, e.g.*, *PNC Bank, Nat'l Ass'n v. Smith*, 225 So. 3d 294 (Fla. 5th DCA 2017) (mortgagee's unclean hands relating to its handling of a second loan was not a bar to foreclosure of mortgage securing different loan; mortgage on which foreclosure was sought was not secured by the second loan and such loan was not at issue); *Pennington v. Pennington,* 390 So.2d 809, 810 (Fla. 5th DCA 1980) (husband was not barred by unclean hands from seeking to compel wife to convey her interest in marital home despite the fact that he had failed to pay child support through the clerk of court as required by settlement agreement; the wrongs were unrelated).  "The relevancy of the doctrine of unclean hands is not gauged by the personal character of a [party], but by his conduct *with reference to the subject matter, the transaction, under scrutiny*."  *See Losey v. State ex rel. Giblin*, 28 So. 2d

604, 606 (Fla. 1947) (emphasis added).   Undersigned counsel is aware of no authority for the proposition that an employer who permits a hostile work environment is thereby barred by the unclean hands doctrine from enforcing a non-disclosure agreement against a former employee.[5]

As to the second element, neither party was injured by Riley's allegedly inappropriate comments.  "The fact that a party's conduct is disreputable is entirely irrelevant where," as here, "the party asserting unclean hands is not the target of, and has taken no action in reliance on that conduct, however disdainful of that conduct a court may be." *McCollem v. Chidnese*, 832 So. 2d 194, 196 (Fla. 4th DCA 2002); *see also, e.g.*, *Gastaldi v. Sunvest Resort Communities, LC*, 2010 WL 457243 (S.D. Fla. Feb. 3, 2010) (investors who purchased units in a residential resort complex, which was later abandoned without the investors receiving a refund, were not barred by unclean hands from seeking relief against the seller who made material misrepresentations about the property, despite the fact that the investors allegedly misreported their intentions for the units to their lenders to receive a mortgage, because the seller was not the target of the investors' alleged

---

[5] This is not to say that the doctrine of unclean hands can never bar enforcement of a restrictive covenant against a former employee.  For example, unclean hands may bar an employer from enforcing a non-compete agreement where the employer terminated the employee, forcing her to work elsewhere, for refusing the employer's demand that she defraud customers.  *See Bradley v. Health Coal, Inc.*, 687 So. 2d 329, 334 (Fla. 3d DCA 1997).  However, in such cases, the parties' wrongs are related: Both parties engaged in unfair business practices, and the employee would not have worked elsewhere had the employer not required her to engage in illegal conduct.

In the instant case, by contrast, Lopez and Sanderson were free to separate from employment with plaintiff and work for a competitor like iControl.  They were contractually bound to refrain from disclosing plaintiff's confidential, proprietary information.  A hostile work environment could not force Sanderson and Lopez to disclose plaintiff's confidential, proprietary information.

misrepresentations to their lenders, nor was seller damaged by the investors'
alleged misrepresentations).

It goes without saying that iControl could not have been injured by Riley's
alleged racist or sexist workplace comments.  And Sanderson, for his part, freely
admits he was not.  During his October 7, 2016 deposition, he testified that Riley's
alleged inappropriate comments have no bearing on this case:

> Q.      . . . .  And you would agree with me that\whatever his motive is
> and his reasons have nothing to do with any actions that you
> took that are the subject of this lawsuit?· You're not telling me
> that you took anything from Fintech, you made any statements
> to any potential customers because of anything that Mr. Riley
> ever said or did, are you?
>
> A.. ·   It's an interesting question.· I think part of the reason I'm doing
> what I'm doing is because I took many ideas to Scott.· He told
> me he didn't want to do any of them.· And I was on many rate
> increase calls where customers would complain that they kept
> having their rates raised and that the services being provided
> were not adequate.
>
> And so the reason -- one of the reasons I'm doing what I'm
> doing is because I believe there's a better solution than what
> was out there.· There was one company with a monopoly and
> there's a lot of customers upset, so I do what I do because I
> think there's a marketplace for it.
> ·
> Q.· ·   Okay. ·That was not the question I asked. I appreciate the
> speech, but if you would answer my question.
>
> A.· ·   I thought that was your question.
> ·
> Q.· ·   No, it was not, sir.
>
> A.· ·   Okay.
>
> Q.· ·   If a jury determines that you've taken confidential information
> or you used confidential information or that you've made false
> statements that in a way that constitute an unfair business

27

practice, is it your position that anything that Scott Riley has said or done justifies your having done that?

MR. SBAR:· Object to form.

THE WITNESS:· I can't answer that question.

BY MR. McCREA:

Q· ·   Okay.· Well, specifically, *your lawyer yesterday asked a third party witness about alleged racial remarks made by Mr. Riley.· Is it your position in this litigation that if that had happened, that would justify you making false statements about Fintech or using its confidential information?*

MR. SBAR:· Object to form.

THE WITNESS:· *No.*

[Doc. 48-6, Sanderson, October 7, 2016 Depo.: 203:7-204:24]. (emphasis added).

In short, there is no factual or legal basis for iControl's affirmative defense of unclean hands.

Respectfully submitted,

/s/Tristan J. Reiniers
Richard C. McCrea, Jr.
Florida Bar No. 351539
Email:  mccrear@gtlaw.com
Catherine H. Molloy
Florida Bar No. 33500
Email: molloyk@gtlaw.com
**GREENBERG TRAURIG, P.A.**
101 E. Kennedy Boulevard
Suite 1900
Tampa, Florida  33602
Telephone: (813) 318-5700
Facsimile:  (813) 318-5900
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on June 27, 2018, I electronically filed the foregoing with the Court by using the CM/ECF system, which will send a notice of electronic filing to:

Robert L. Rocke, Esq.
rrocke@rmslegal.com
Jonathan B. Sbar, Esq.
jsbar@rmslegal.com
Andrea K. Holder, Esq.
aholder@rmslegal.com
ROCKE, McLEAN & SBAR, P.A.
2309 S. MacDill Avenue
Tampa, Florida 33629

/s/ Tristan J. Reiniers
Attorney

29