UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FINANCIAL INFORMATION
TECHNOLOGIES, LLC,

       Plaintiff,                      Case No.:  8:17-cv-00190-T-23MAP

vs.

ICONTROL SYSTEMS, USA, LLC,

       Defendant.

_____/

## iCONTROL'S RESPONSE TO
## PLAINTIFF'S MOTION FOR PERMANENT INJUNCTION

Fintech's Motion (Doc. 249) asks this Court to enter a remarkably broad injunction that would forever ban iControl from competing with Fintech in the regulated commerce category, without so much as a reference to any of the supposed trade secrets at issue in this case.  Neither Florida law nor traditional principles of equity authorize such a sweeping restraint on competition. Florida courts have repeatedly held that injunctions under the Florida Uniform Trade Secrets Act ("FUTSA") must be limited to protecting specific, identifiable trade secrets.  Traditional principles of equity also preclude Fintech's requested injunction, which would cause severe and unjustifiable harm to both iControl's interest in operating its legitimate business and the public's interest in lawful competition.  Fintech has not tried to craft a more narrowly tailored injunction—which the record would not support in any event—and the Court should decline to do Fintech's work for it. The Motion should be denied.

## LEGAL STANDARD

A permanent injunction is "a drastic and extraordinary remedy."  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010).  It "does not follow from success on the merits as a matter

of course." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008); *accord First Nat'l Bank in St. Petersburg v. Ferris,* 156 So. 2d 421, 423 (Fla. 2d DCA 1963).  To justify a permanent injunction, Fintech "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

In addition, even where an injunction is warranted, it "should be narrowly tailored to fit the specific legal violations adjudged" and "should be tailored to restrain no more than what is reasonably required to accomplish its ends." *Keener v. Convergys Corp.*, 342 F.3d 1264, 1269 (11th Cir. 2003) (internal quotation marks omitted).  The Court must therefore make clear and specific findings to justify any injunction it chooses to enter.  An injunction must "state the reasons why it issued," "state its terms specifically," and "describe in reasonable detail … the act or acts restrained or required."  Fed. R. Civ. P. 65(d).

Here, because it is "impossible to tell from the general verdict" which alleged trade secrets the jury found were protected and had been misappropriated, if the Court were to enter an injunction, it would have to "determine[] the scope of the injunction based upon [its own] view of the facts established by the evidence." *United States v. An Article of Drug*, 661 F.2d 742, 746-47 (9th Cir. 1981).  The jury answered "Yes" to the general question "Did Fintech prove by a preponderance of the evidence that iControl misappropriated Fintech's trade secrets?"  Doc. 245 at 1.  It was not asked to, and did not, make any findings about which of the alleged trade secrets were (1) protectible as trade secrets in the first place or (2) misappropriated by iControl.  iControl had suggested that the verdict form include interrogatories about each alleged trade secret, but the

Court determined that a general verdict form was more appropriate in light of the way Fintech chose to present its case.  As a result, the verdict does not supply the findings necessary to justify any injunction, let alone the sweeping, anti-competitive injunction Fintech requests.  *See McCarthy v. Fuller*, 810 F.3d 456, 460-61 (7th Cir. 2015) (where jury's general verdict found that defendants had defamed plaintiffs and should pay damages but "didn't indicate specifically which [statements] it found to be defamatory and to have been made by the defendants, the judge had no basis in the jury's verdict for issuing an injunction" and had to "mak[e] his own factual determinations" to justify any injunction he chose to enter);  *N. Ind. Gun & Outdoor Shows, Inc. v. Hedman*, 104 F. Supp. 2d 1009, 1011 (N.D. Ind. 2000) (where court could not "say with confidence what findings the jury made to reach" its general verdict, and it was "conceivable that no majority (much less unanimity) existed" as to any one theory of liability, court made its own factual findings and concluded no permanent injunction was warranted).

## ARGUMENT

I.    **Fintech has not shown that it is entitled to a sweeping injunction prohibiting iControl from doing business in the area of regulated commerce.**

Fintech asks the Court to enter an astonishingly broad injunction that would permanently bar iControl from competing with Fintech in the regulated commerce industry.  But Florida law does not permit such a sweeping, anti-competitive injunction.  And even if it did, Fintech has made no effort to show that the equities support its request.

"Florida courts are clear that FUTSA 'may not be used as a vehicle to restrict competition.'" *AutoNation, Inc. v. Mulleavey*, 2019 WL 4693575, at *6 (S.D. Fla. Aug. 22, 2019). Rather, an injunction under FUTSA must be limited to prohibiting "[a]ctual or threatened misappropriation."  § 688.003(1), Fla. Stat.  Florida courts have thus consistently refused to enter injunctions under FUTSA that go "beyond enjoining use of the misappropriated trade secrets" and

require defendants to "refrain from all competition" with the plaintiff. *East v. Aqua Gaming, Inc.*, 805 So. 2d 932, 935 (Fla. 2d DCA 2001); *see, e.g.*, *Norton v. Am. LED Tech., Inc.*, 245 So. 3d 968, 969 (Fla. 1st DCA 2018) (affirming injunction insofar as it addressed specific trade secrets but reversing "the portion of the order enjoining [defendant] from competing in the industry, as [F]UTSA does not authorize such relief"); *Sethscot Collection, Inc. v. Drbul*, 669 So. 2d 1076, 1078 (Fla. 3d DCA 1996) (enjoining defendant from utilizing trade-secret customer list but holding that "defendant is in no way enjoined from competing with the plaintiffs"); *AutoNation*, 2019 WL 4693575, at *6 (enjoining defendant from using confidential information but refusing to enjoin him from competing in plaintiff's line of business). *See also* Restatement (Third) of Unfair Competition § 44 (the scope of an injunction in a trade-secrets case "should be carefully framed to avoid undue restraint on legitimate competition"). Notably, all the Florida cases on which Fintech relies involved injunctions that were limited to preventing the use or disclosure of specific, identifiable trade secrets. *See* Mot. at 2-3 (citing cases).

Without making any attempt to show that its requested injunction is consistent with Florida law, Fintech cites a pair of out-of-state cases (one more than 60 years old) where trial courts enjoined a defendant from competing with the plaintiff. But even those cases do not support Fintech's proposed injunction. In *General Electric Co. v. Sung*, 843 F. Supp. 776 (D. Mass. 1994), the court enjoined the defendant from producing saw-grade diamonds for seven years because it found that the defendant's process for producing those diamonds was "inextricably connected to" and "entirely dependent upon" the misappropriated trade secrets. *Id.* at 780. Critical to that conclusion was that the defendant had no "significant and comparable, pre-existing design of its own prior to the misappropriation of the trade secrets." *Id.* Likewise, in *Head Ski Co. v. Kam Ski Co.*, 158 F. Supp. 919 (D. Md. 1958), the court enjoined the defendants from manufacturing

adhesively bonded skis because "defendants' entire operation [was] built upon plaintiff's techniques, methods, materials and design" and it would have been "impracticable if not impossible to enumerate all the secrets learned by defendants while working for plaintiff." *Id.* at 924.

Even setting aside the fact that *General Electric* and *Head Ski* are inconsistent with Florida law, the circumstances here are not remotely like those that led to the broad injunctions in those cases. Unlike in *General Electric*, in this case it was undisputed that before any of the alleged misappropriation took place, iControl already had its own pre-existing software platform that allowed it to process payments for clients, including clients in the regulated alcohol category. iControl had been providing scan-based trading and direct-store-delivery payment services in non-alcohol categories since 2005, using "extremely sophisticated" software to serve "tens of thousands" of stores and process "[m]illions upon millions of invoices." 2/27 Tr. 90:13-19, 94:14-20, 105:18-24 (testimony of Tal Zlotnitsky). To process alcohol payments, iControl merely had to make some adjustments to its existing platform; it did not have to create an entirely new platform, as "the underlying capabilities were … almost entirely the same." *Id.* at 105:25-106:18; *see also* 2/25 Tr. 116:3-5, 140:18-141:9 (testimony of Bill Harris).

Moreover, Fintech has never disputed that iControl started a pilot program processing alcohol payments for Spartan Stores in April 2013, before the alleged misappropriation took place. *E.g.,*, 2/27 Tr. 104:6-105:9. Fintech's assertion that "iControl's entry into the regulated commerce business was premised on its misappropriation of Fintech's trade secrets" (Mot. at 5) is therefore false. Fintech has likewise conceded that its supposed proprietary processes are "not the only way that these same-day payments and other services can occur" and that "there are other companies" that are able to provide similar services without using Fintech trade secrets. 2/25 Tr. 33:25-34:5.

There is thus no basis on which the Court could find that processing regulated-commerce payments is "inextricably connected" to the use of Fintech's trade secrets (*General Electric Co.*, 843 F. Supp. at 780) or that iControl's "entire operation" was "built upon" those trade secrets (*Head Ski Co.*, 158 F. Supp. at 924). Nor is there any record evidence that iControl—which no longer employs Mark Lopez, *see* 2/28 Tr. 136:1-4—is currently using any identifiable Fintech trade secrets.[1]

Nor does Fintech claim that it would be "impossible to enumerate" its trade secrets. *Head Ski Co.*, 158 F. Supp. at 924. On the contrary, Fintech's expert witness, Ivan Zatkovich, purported to do just that. In his lengthy testimony, he claimed to be able to identify and describe each of the supposed trade secrets at issue. *See, e.g.*, 2/26 Tr. 138:11-140:3 (summarizing the alleged trade secrets). To be sure, Mr. Zatkovich's testimony was often vague and confusing, and many of the product features he identified as trade secrets do not qualify for protection under FUTSA. *See infra* at 9-11. And the jury's general verdict does not specify which of the alleged trade secrets the jury found protectible. Regardless, Fintech did not try this case on the theory that its trade secrets were impossible to enumerate, and it is not entitled to an injunction on that theory either. Fintech's suggestion that the Court enter an overbroad injunction to "punish" iControl, Mot. at 7, is likewise inconsistent with Florida law, which makes clear that "[t]he purpose of an injunction is to prevent irreparable injury; the purpose is not to punish." *Dyer v. Pioneer Concepts, Inc.*, 667 So. 2d 961, 965 n.3 (Fla. 2d DCA 1996) (citation omitted).

---

[1] Moreover, since the time of the alleged misappropriation, iControl has significantly expanded its offerings not only through internal development, but also through its 2016 acquisition of eSkye, a company that provided pricebook management services for alcohol products. The software capabilities that iControl acquired from eSkye are not the product of any alleged misappropriation, and there is no basis in law or equity to enjoin iControl from offering those capabilities to its customers as Fintech's proposed injunction would do.

Fintech has also failed to show that its requested injunction is consistent with "the balance of equities and consideration of the public interest." *Winter*, 555 U.S. at 32. In determining whether to grant injunctive relief, the Court must weigh "the interest of the plaintiff in preserving the commercial advantage inherent in" particular trade secrets against both "the interest of the defendant in avoiding interference with legitimate business transactions" and "the interest of the public in fostering innovation and promoting vigorous competition." Restatement (Third) of Unfair Competition § 44. In its zeal to wipe out its biggest competitor, Fintech simply ignores the latter two interests. But there is no doubt that an injunction barring iControl from competing with Fintech in the regulated commerce category would cause significant, unjustified harm to both iControl and the public at large. iControl employs approximately 100 people, 2/27 Tr. 114: 15-17, many of whom would lose their jobs if the Court were to enter Fintech's requested injunction. Fintech would also be able to raise its prices considerably, and thousands of businesses that rely on iControl's services would experience significant disruption. *See, e.g.*, 2/27 Tr. 102:11-15 (before iControl entered the market, Fintech had sufficient market power to impose a 40% price increase on its customers); *id.* at 118:1-6 (iControl currently serves 10% of the regulated commerce market). Fintech fails to explain why incurring those harms is necessary to protect its trade secrets.[2]

Fintech has also failed to justify the temporal sweep of its proposed injunction. An injunction in a trade-secrets case should be limited to "the period of time it would have taken" the

---

[2] Indeed, Fintech is already using the jury's verdict to disrupt iControl's legitimate business by distributing to iControl's customers a misleading press release that falsely claims iControl "built [its] payments business largely by maliciously stealing [Fintech's] trade secrets." *See* Press Release, *Fintech, LLC Wins Trade Secret Theft Lawsuit Against iControl Systems USA, LLC*, https://www.fintech.com/news/fintech-llc-wins-trade-secret-theft-lawsuit-against-icontrol-systems-usa-llc/. Entering Fintech's overbroad injunction would only compound the harm Fintech is already causing to iControl and its customers.

7

defendant, "either by reverse engineering or by independent development, to develop its [product] legitimately without use of the [plaintiff's] trade secrets." *K-2 Ski Co. v. Head Ski Co.*, 506 F.2d 471, 474 (9th Cir. 1974); *see also Concept, Inc. v. Thermotemp, Inc.*, 553 So. 2d 1325, 1328 (Fla. 2d DCA 1989) (citing *K-2* with approval). Here, Fintech's own expert admitted that "[g]iven time," iControl "certainly" could have developed on its own "the specific functionality that [he] described … as FinTech's proprietary information and software." 2/26 Tr. 163:20-164:1. Any injunction can last no longer than the time it would have taken for iControl to independently develop any elements of its product that the Court determines were misappropriated. Fintech has not pointed to any evidence in the record that would allow the Court to determine the length of that time period; and given the length of these proceedings, it is highly likely that the period has already expired. In any event, the evidence does not remotely support Fintech's proposed perpetual injunction against competition.

## II.     The Court should decline to craft a narrower injunction that Fintech has neither requested nor sought to justify.

For the reasons set forth above, Fintech has not shown that it is entitled to an injunction that would completely and permanently bar iControl from competing with Fintech in the area of regulated commerce. Yet Fintech has not offered any alternative to its sweeping proposal. Consistent with the "all or nothing" strategy it used at trial, Fintech declined to propose a narrower injunction, one that might have been tailored to protect specific trade secrets. And as explained above, the jury's general verdict does not contain the factual findings that would be necessary to allow the Court to craft such an injunction. The Court would have to make any such factual findings itself. And Fintech has neither asked the Court to do so nor given it any basis for doing so. Fintech's facile claim that "[a]n injunction prohibiting what the Court already determined to be unlawful would not burden iControl except to the extent iControl wishes to continue violating

the law" (Mot. at 4) ignores that the Court has not determined any of iControl's conduct to be unlawful and there is no way to know, thanks to Fintech's tactical choice about how to present its case, what the jury found. Accordingly, Fintech has not carried its burden, and the Court should deny the Motion and decline to enter any injunction. *See Montgomery v. Fla. First Fin. Grp., Inc.*, 2008 WL 3540374, at *12 (M.D. Fla. Aug. 12, 2008) ("The party seeking a permanent injunction has the burden of proof.").

Even assuming the Court could take up Fintech's burden itself, make particularized findings (which Fintech has not requested) about which of Fintech's alleged trade secrets are protectible and which were misappropriated, and *sua sponte* fashion an injunction that would be narrowly tailored to protect any such genuine and misappropriated trade secrets, the Court should exercise its discretion not to do so. *See eBay*, 547 U.S. at 391 ("[T]he decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court."). Because Fintech did not ask for particularized findings or propose a narrower injunction, iControl has had no notice of what terms such an injunction might contain and no opportunity to respond to them. For the Court to create an injunction out of whole cloth under these circumstances would thus violate iControl's right to due process. *See Daker v. Governor of Ga.*, 2020 WL 1130844, at *1 (11th Cir. Mar. 9, 2020) (due process requires notice and an opportunity to be heard before a permanent injunction can be entered).

Moreover, the lack of clarity in the jury's verdict and the blanket nature of Fintech's proposed injunction are no accident. Focusing on discrete trade secrets on an individual basis would shine a light on the fundamental problem with Fintech's case, which is that it has not proved the misappropriation of protectible trade secrets in the first place. As iControl will explain in more detail in its forthcoming motion for a new trial, Fintech's evidence fell short of proving that it has

*any* protectible trade secrets that are incorporated in iControl's product. For one thing, many of the supposed "trade secrets" Mr. Zatkovich identified in his testimony are readily ascertainable features and functions of Fintech's software. For example, Mr. Zatkovich testified that all of the following are trade secrets: (1) an "in-system editor" that lets customers correct errors in previously submitted invoices; (2) a "user portal" that lets customers designate what information each user can access; and (3) "analytic reports" that allow customers to access and review certain data. *See, e.g.*, 2/26 Tr. 139:2-24. But "outward-facing features that every user of [a software program] can see and experience are not trade secrets." *Calendar Research LLC v. StubHub, Inc.*, 2018 WL 4846797, at *4 (C.D. Cal. Aug. 7, 2018); *see also, e.g.*, *IDX Sys. Corp. v. Epic Sys. Corp.*, 285 F.3d 581, 584 (7th Cir. 2002) ("details that ordinary users of the software could observe without reverse engineering" are not trade secrets); *Warehouse Sols., Inc. v. Integrated Logistics, LLC*, 2014 WL 12647878, at *6 (N.D. Ga. July 7, 2014) ("[T]he appearance and functionality of [a] software program are not trade secrets."), *aff'd*, 610 F. App'x 881 (11th Cir. 2015); *Agency Solutions.Com, LLC v. TriZetto Grp., Inc.*, 819 F. Supp. 2d 1001, 1019 (E.D. Cal. 2011) ("[I]nformation that is reflected in the way software functions from the point of view of the user is not trade secret information."). To be sure, the computer-programming "source code" underlying those features and functions might qualify as a trade secret; but there is no allegation or evidence that iControl copied, or even had access to, Fintech's source code. *See* 2/26 Tr. 158:15-23 (testimony of Ivan Zatkovich).[3]

---

[3] Mr. Zatkovich admitted that he had never inspected iControl's systems and could not even determine whether the features he claimed were misappropriated were actually incorporated by iControl. For example, Mr. Zatkovich admitted that he had "no direct evidence" that iControl actually used any information provided by Mr. Lopez regarding Fintech. 2/26 Tr. 187:21-188:1.

Other "trade secrets" identified by Mr. Zatkovich are equally problematic.  Some relate to basic functions, like rounding numbers, that are inherent in any payment-processing business and cannot possibly rise to the level of proprietary trade secrets (and that iControl in any event performs differently than Fintech).  *See, e.g.*, 2/28 Tr. 189:2-10 (testimony of Dr. Sam Malek) ("I'm just surprised that in 2020 we are discussing whether rounding of numbers is a trade secret.  It is not a trade secret, because, you know, they teach that in third or fourth grade."); *id.* at 189:11-190:9 (explaining that iControl's software does not use the same rounding method as Fintech's).  Still others are dictated by customers rather than Fintech.  For example, Mr. Zatkovich testified that Fintech's "customer-specific interfaces" were trade secrets.  *See* 2/26 Tr. 139:13-15.  But as Dr. Malek explained, those "interfaces" are simply a fancy way of saying that both Fintech and iControl must use their customers' predetermined file formats.  *See* 2/27 Tr. 190:15-191:7 (each customer "already has a format that they use for accepting … payments," and "if you are a third-party payment processing company, such as FinTech or iControl, you are going to have to abide by the file format that they require"); *see also* 2/25 Tr. 190:8-14 (testimony of Fintech's former Chief Technology Officer, Walter Pickel, explaining that interfaces are dictated by customers' preexisting systems and standards).  Again, there is no claim that iControl copied any source code that Fintech wrote for its interfaces—only that iControl, like Fintech, had to design its software to be compatible with the particular file formats that its customers required.

These are just a few of the many serious problems with Fintech's alleged "trade secrets."  iControl's new-trial motion will explain these problems in greater depth.  For present purposes, it is enough to point out that Fintech's decision to seek only an overbroad anti-competition injunction stems from its inability to support a more narrowly tailored injunction with the evidence it presented at trial.  The Court should not relieve Fintech of the consequences of that tactical choice.

**CONCLUSION**

The Court should deny the Motion.  Fintech seeks only a sweeping, perpetual injunction that would prevent iControl from competing with Fintech in the regulated commerce category indefinitely.  FUTSA, as interpreted by the Florida courts, does not authorize Fintech's requested injunction; nor would that injunction be consistent with traditional principles of equity.  And the Court should not attempt to craft a narrower injunction that Fintech has not asked for and that would require the Court to make factual findings about the supposed "trade secrets" that iControl has not had a fair opportunity to rebut and that, in any event, the record would not support.

/s/ Jonathan B. Sbar
Robert L. Rocke, Esq. (FBN 710342)
Email:  rrocke@rmslegal.com
Jonathan B. Sbar, Esq. (FBN 131016)
Email:  jsbar@rmslegal.com
ROCKE, McLEAN & SBAR, P.A.
2309 S. MacDill Avenue
Tampa, FL  33629
Phone:  813-769-5600
Fax:      813-769-5601
Attorneys for iControl Systems USA, LLC

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished to the following by Electronic Mail on March 17, 2020.

Richard C. McCrea, Jr., Esq. (FBN 351539)
Catherine H. Molloy, Esq. (FBN 33500)
Greenberg Traurig, P.A.
101 E. Kennedy Blvd., Suite 1900
Tampa, FL  33602
Phone:  813-318-5700
Fax:      813-318-5900
Email:  mccrear@gtlaw.com
Email:  molloyk@gtlaw.com
Attorneys for Plaintiff

/s/ Jonathan B. Sbar
Attorney