**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**FINANCIAL INFORMATION**
**TECHNOLOGIES, LLC,**

      **Plaintiff,**

**v.**                          **CASE NO. 8:17-cv-00190-SDM-SPF**

**ICONTROL SYSTEMS, USA, LLC,**

      **Defendant.**

_____/

## <u>PLAINTIFF'S RENEWED MOTION FOR PERMANENT INJUNCTION</u>

Plaintiff, Financial Information Technologies, LLC ("Fintech"), by and through its undersigned counsel and pursuant to Federal Rule of Civil Procedure 65 and this Court's August 25, 2020 Order [Doc. 283], hereby renews its motion for entry of a permanent injunction to prohibit iControl from utilizing the specific trade secrets that Fintech proved iControl has misappropriated at trial. The grounds upon which the instant motion is based are set forth in the following Preliminary Statement and Supporting Memorandum of Law.

**I.**

## <u>PRELIMINARY STATEMENT</u>

In accordance with the Court's Order [Doc. 283], Plaintiff submits this preliminary statement addressing its excusable neglect for failing to timely move for the renewed permanent injunction. In addition, Plaintiff submits the attached

declarations of Catherine H. Molloy ["Molloy Dec. at ¶_"] and Rodolfo Leal ["Leal Dec. at ¶_"], which are attached as Exhibits B and C, respectively.

Undersigned counsel and Plaintiff apologize to the Court and counsel for missing the August 17, 2020 deadline and appreciate the opportunity to further demonstrate that this failure was the result of "excusable neglect" pursuant to Rule 6(b)(1)(B).

On August 10, 2020, this Court entered an Order denying Plaintiff's Motion for Permanent Injunction without prejudice and allowing Plaintiff until August 17, 2020 to file a renewed motion for permanent injunction "to identify with reasonable specificity the trade secrets for which Fintech demands an injunction." [Dkt. No. 279].

Undersigned counsel was working remotely on August 10, 2020 due to the COVID-19 pandemic when she received the Order, and inadvertently failed to ensure the August 17, 2020 deadline was calendared.  [Molloy Dec. at ¶ 4].  Undersigned counsel's failure was compounded by the fact that the associate assigned to the case, Mr. Reiniers, recently left the firm.  [*Id.* at ¶ 5]. In addition, undersigned counsel's office likewise inadvertently failed to calendar the August 17, 2020 deadline for either undersigned counsel or co-counsel Richard C. McCrea, Jr.   [*Id.* at ¶ 9].[1]

---

[1] Undersigned counsel has subsequently learned that this failure was due to an oversight in the new calendaring system recently implemented by the firm. [*Id.*; *see also* Leal Dec. at ¶¶ 3-5). Specifically, as set forth in the declaration of Greenberg Traurig P.A.'s Business Director, Rodolfo Leal, both Ms. Molloy and Mr. McCrea transitioned to a new calendaring system in May 2020 pursuant to which all calendaring was to be performed by a centralized docketing team rather than legal assistants.  [Leal Dec. at ¶¶ 3-4].  Due to a breakdown in the workflow process for this system, the deadline was not calendared.  [*Id.* at ¶ 5].  Undersigned counsel and her firm have taken steps to ensure that this error does not occur again.  [Molloy Dec. at ¶ 10; *see also* Leal Dec. at ¶ 5].

The next day, on August 11, 2020, Defendant requested the parties initiate settlement discussions, and Defendant also requested Plaintiff stay execution of the judgment pending those discussions and pending its anticipated appeal.  [Molloy Dec. at ¶ 6].  On August 11, 2020, undersigned counsel spoke with Defendant's counsel about the request for settlement discussions and a stay and informed Defendant's counsel it intended to renew the motion for permanent injunction and would have to otherwise discuss the request for stay with her client. [Molloy Dec at ¶ 6].   The parties subsequently scheduled a meeting to discuss settlement on August 18, 2020, and undersigned counsel ultimately agreed not to pursue collection efforts pending further discussion with her client. [Molloy Dec at ¶ 7].   In doing so, because the August 17, 2020 deadline had not been calendared, undersigned counsel did not realize that the settlement discussions would not occur until after the renewed motion for permanent injunction was due. [Molloy Dec at ¶ 7].  On August 20, 2020, Defendant informed Plaintiff that it had missed the August 17, 2020 deadline, and, recognizing her neglect, undersigned counsel immediately prepared and filed a motion for extension.  [Molloy Dec at ¶ 8]. Plaintiff subsequently filed its Renewed Motion for Permanent Injunction on August 21, 2020 consistent with the requested extension.

Pursuant to Rule 6(b)(1)(B) of the Federal Rules of Civil Procedure, Plaintiff's untimely filing is supported by excusable neglect under the circumstances presented. In considering whether excusable neglect exists, Courts typically look to the following four factors: "the danger of prejudice to the [nonmovant], the length of delay and its potential impact on judicial proceedings, the reason for the delay, including whether it

3

was within the reasonable control of the movant, and whether the movant acted in good faith." *See Pioneer Investment Services v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380, 398 (1993). Excusable neglect can include an "inadvertent or negligent omission." *Id; see also Kirkland v. Guardian Life Ins. Co. of Am.*, 352 F. App'x 293, 297 (11th Cir. 2009) (affirming holding that inadvertent calendaring mistake leading to one day delay in filing pleading was due to excusable neglect). Courts afford "primary importance to the absence of prejudice to the nonmoving party and to the interest of efficient judicial administration." *Ashmore v. Sec'y, DOT*, 503 F. App'x 683, 686 (11th Cir. 2013)

In the present case, each of these factors weighs in favor of finding excusable neglect.  Defendant cannot show they were prejudiced by the untimely filing, as the length of delay was minimal. Fewer than 72 hours elapsed between the deadline for the motion, at midnight on August 17, 2020,  and the filing of the motion for extension of time, on August 20, 2020, followed shortly thereafter by the proposed renewed motion. Prior to the expiration of the deadline, undersigned counsel had informed Defendant's counsel that Plaintiff would file a renewed motion. *See Mead v. Ids Prop. Cas. Ins. Co.*, No. 8:13-cv-2206-T-24-AEP, 2013 U.S. Dist. LEXIS 202791, at *6 (M.D. Fla. Nov. 26, 2013) (one-day delay in filing motion due to clerical calendaring mistake was due to excusable neglect and there was no was no prejudice when moving party had notified opposing party of intent to file motion prior to expiration of deadline).  The Parties were continuing settlement discussions in the interim and thus Defendant was not "lulled or otherwise prejudiced by the untimely filing."  *See, e.g., Cheney v. Anchor*

*Glass Container Corp.*, 71 F.3d 848, 850 (11th Cir. 1996) (finding excusable neglect where the plaintiff filed a request for trial *de novo* six days late and the parties were engaged in settlement discussions and continuing discovery in the interim).  Notably, Plaintiff filed its Renewed Motion for Permanent Injunction on August 21, 2020, just eleven days after the Court's Order denying its original motion without prejudice.  The extremely brief delay along with Plaintiff expressly telling Defendant that the Renewed motion would be filed, weigh against any finding of prejudice.

The reason for the delay and whether the movant acted in good faith also weigh in favor of finding excusable neglect. Undersigned counsel and her office failed to calendar the August 17, 2020 deadline set forth in the Order due to a conversion to a new calendaring system. Furthermore, the associate assigned to the case recently left the firm which contributed to confusion and contributed to the calendaring issue not being identified. Undersigned counsel immediately requested an extension upon recognizing her failure to timely file the renewed motion.  *See Walter v. Blue Cross & Blue Shield United of Wis.*, 181 F.3d 1198 (11th Cir. 1999) (finding excusable neglect where "the reason for the delay was the failure of a former secretary of [plaintiff's] attorney to record the applicable deadline"); *see also Cheney*, 71 F.3d at 850 (finding excusable neglect where the "delayed filing was a failure in communication between the associate attorney and the lead counsel"). Courts in the Middle District of Florida have held that calendaring errors can constitute excusable neglect. *See Esprit Stones Private, Ltd. v. Rio Stone Grp. Inc.*, No. 6:19-cv-637-Orl-41LRH, 2020 U.S. Dist. LEXIS 59152, at *8 (M.D. Fla. Mar. 17, 2020) (missed deadline from court order that

was seen by law firm but not calendared was due to excusable neglect); *Vieczorek v. Khorrami*, No. 3:17-cv-1118-J-32JBT, 2019 U.S. Dist. LEXIS 112243, at *2 (M.D. Fla. July 8, 2019) (inadvertent calendaring issue that delayed a responsive pleading constituted excusable neglect); *Strong v. Geico Gen. Ins. Co.*, No. 8:16-cv-1757-T-36JSS, 2016 U.S. Dist. LEXIS 179692, at *3 (M.D. Fla. Dec. 29, 2016) (calendaring and staffing error resulting in motion for extension of time filed one week after deadline was excusable neglect). As set forth in the supporting declarations, the missed deadline was due to a calendaring mistake caused by a new calendaring system and turnover in staffing, which was promptly addressed upon the discovery of the error.

Finally, Fintech's renewed motion should also be permitted because the danger of prejudice to Fintech is great if the motion is not allowed, as the jury found at trial that iControl has misappropriated Fintech's trade secrets and awarded Fintech $5.7 million as a result. The judgment was entered on March 5, 2020, and Fintech moved for a permanent injunction on the same date.  [*See* Dkt. Nos. 249 and 251]. As set forth in Fintech's Motion for Permanent Injunction, Fintech has suffered irreparable injury as a result of iControl's misappropriation, and its inability to file a renewed motion due to undersigned counsel's neglect would result in extreme prejudice to Fintech, as iControl would be permitted to continue using the trade secrets which a jury found it had misappropriated from Fintech. "The determination of whether to accept a late filing based on excusable neglect is 'at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission.'" *Vieczorek v.*

*Khorrami*, 2019 U.S. Dist. LEXIS 112243, at *2 (citing *Pioneer Inv. Servs. V. Brunswick Assocs. Ltd. P'ship*).

For all these reasons, Plaintiff respectfully requests the Court find that its failure to timely file this renewed motion was the result of excusable neglect.

II

**SUPPORTING MEMORANDUM OF LAW**

A.   **BACKGROUND**

In January of 2017, Fintech sued iControl for misappropriation of trade secrets in violation of the Florida Uniform Trade Secrets Act ("FUTSA"), among other things. [Doc. 1].  On March 2, 2020, the jury found that iControl willfully and maliciously misappropriated Fintech's trade secrets and awarded $2.7 million in compensatory damages and $3 million in exemplary damages.  Following the jury verdict, on March 5, 2020, Fintech sought entry of a permanent injunction to prevent any further misappropriation of its trade secrets by prohibiting iControl from doing business in the regulated commerce industry.  On August 10, 2020, the Court entered an Order denying Fintech's motion without prejudice and allowing Fintech to file a renewed motion identifying with reasonable particularity the specific trade secrets for which Fintech requests an injunction.  [Do. 279].

B.   **LEGAL STANDARD**

The Florida Uniform Trade Secrets Act ("FUTSA") authorizes the Court to permanently enjoin iControl from misappropriating Fintech's trade secrets. *Fla. Stat.* § 688.003 (2019).[2]  In trade secrets cases, "both injunctive and monetary relief are appropriate: monetary relief to compensate the plaintiff for existing losses and injunctive relief to prevent future loss through further use or disclosure of the trade secret." RESTATEMENT (THIRD) OF UNFAIR COMPETITION, § 44, cmt. b & Reporter's Notes to cmt. b (1995);[3] *see also Sensormatic Elecs. Corp. v. TAG Co. US, LLC*, 632 F. Supp. 2d 1147, 1187 (S.D. Fla. 2008) (plaintiff manufacturer was entitled to permanent injunction under FUTSA prohibiting rival manufacturer from using or disclosing plaintiff's manufacturing specifications because future disclosure or use of the specifications would cause irreparable injury); *Delucca v. GGL Indus., Inc.*, 712 So.2d 1186, 1187 (Fla. 4th DCA 1998) (upholding permanent injunction under FUTSA prohibiting employee from disclosing former employer's trade secrets, consisting of tax returns, documents reflecting income, customers' names and addresses, etc., despite the employee's testimony that he was "no longer employed and ha[d] destroyed all evidence which he had in his possession," reasoning that "the trial court may well have found [that testimony was] not . . . credible"); *Thomas v. Alloy Fasteners, Inc.*, 664 So.2d 59, 60 (Fla. 5th DCA 1995) (employer was entitled to permanent injunction under FUTSA against use of confidential information about employer's pricing and profit structure contained in "order edit lists" that were misappropriated by former employee).

8

The elements required to show entitlement to a permanent injunction are as follows:   (1) The plaintiff "has suffered an irreparable injury; (2) th[e] remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) . . . considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) . . . the public interest would not be disserved by a permanent injunction." *800 Adept, Inc. v. Murex Sec., Ltd.*, 505 F. Supp. 2d 1327, 1335 (M.D. Fla. 2007), *aff'd in part, vacated in part, rev'd in part on other grounds*, 539 F.3d 1354 (Fed. Cir. 2008).  "Thus, the standard for permanent injunctive relief is essentially the same as for preliminary injunctive relief, except that the movant must show actual success on the merits instead of a likelihood of success on the merits." *B & F Sys. v. Leblanc*, 2012 U.S. Dist. LEXIS 90504, at *20-21 (M.D. Ga. June 29, 2012). In the instant case, Fintech has done so.

## C.   <u>FINTECH HAS MET THE ELEMENTS OF INJUNCTIVE RELIEF</u>

Fintech has suffered irreparable injury, and remedies at law are inadequate. "[I]njunctive relief is routinely granted in trade secret cases" because of "[t]he inadequacy of monetary relief and the risk of a destruction of trade secret rights through public disclosure."  RESTATEMENT (THIRD) OF UNFAIR COMPETITION, § 44, cmt. c & Reporter's Notes on cmts. b & g (1995) (collecting cases); *Sensormatic Elecs. Corp.*, 632 F. Supp. 2d at 1182, 1187 (future disclosure or use of plaintiff's trade-

---

[2] "Actual or threatened misappropriation may be enjoined," and "[i]n appropriate circumstances, affirmative acts to protect a trade secret may be compelled by court order."

[3] Case law interpreting other states' uniform trade secrets acts is persuasive because the Florida Trade Secrets Act "shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this act among states enacting it." *Fla. Stat.* § 688.009 (2019).

secret specifications would erode plaintiff's market share, which would cause irreparable injury).   The RESTATEMENT (THIRD) OF UNFAIR COMPETITION (hereinafter "RESTATEMENT") elaborates:

> Injunctive relief is often appropriate in trade secret cases to insure against additional harm from further unauthorized use of the trade secret and to deprive the defendant of additional benefits from the appropriation.  If the information has not become generally known, an injunction may also be appropriate to preserve the plaintiff's rights in the trade secret by preventing a public disclosure.  If the trade secret has already entered the public domain, an injunction may be appropriate to remedy any head start or other unfair advantage acquired by the defendant as a result of the appropriation.

RESTATEMENT (THIRD) OF UNFAIR COMPETITION, § 44, cmt. c (1995).

The balance of hardships favors Fintech because the jury concluded that iControl willfully and maliciously misappropriated Fintech's trade secrets.  The jury awarded Fintech compensatory damages for its lost revenue to date, but these damages do not address the ongoing and future damage to Fintech based on its continuing lost revenue.  An injunction prohibiting what the Court already determined to be unlawful would not burden iControl except to the extent iControl wishes to continue violating the law. Fintech, on the other hand, faces continued losses due to the misappropriation of its trade secrets. *See Sensormatic Elecs. Corp.*, 632 F. Supp. 2d at 1182 ("The balance of hardships favors injunctive relief because the burden placed on defendants by an injunction would consist only of the cost of forgoing infringing conduct.  This can hardly be accorded substantial weight in an equitable balancing of factors.  On the other hand, [plaintiff] faces harm to its market share and

10

reputation in the market for [trade secret products], which it went to great efforts to research and develop.  This harm easily outweighs any potential harm to defendants").

Entry of a permanent injunction would in no way disserve the public interest. Courts have recognized that the public interest is served by strong intellectual property protections.  *Id.* (*citing Abbot Labs v. Andrx Pharms., Inc.*, 452 F.3d 1331, 1348 (Fed. Cir. 2006)).   An injunction would also serve the public interest because Fintech's employment agreements with Mark Lopez and Andrew Sanderson prohibit them from disclosing Fintech's trade secrets[4], and "enforcement of a valid restrictive covenant encourages parties to adhere to contractual obligations."  *7-Eleven, Inc. v. Kapoor Bros., Inc.*, 977 F. Supp. 2d 1211, 1230 (M.D. Fla. 2013).

D.    **SCOPE OF THE INJUNCTION**

As this Court has recognized, "the Florida Uniform Trade Secrets Act authorizes the injunction of specific, identifiable trade secrets."  [Doc. 279] (*citing East v. Aqua Gaming, Inc.*, 805 So.d 932, 935 (Fla. 2d DCA 2001); *Norton v. Am. LED Tech., Inc.*, 245 So.3d 968, 969 (Fla. 1st DCA 2018)). The FUTSA defines a trade secret as:

> information, including a formula, pattern, compilation, program, device, method, technique, or process that:
>
> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

---

[4] *See* Plaintiff's Trial Exhibits 88, 91, 249, and 323.

§ 688.002(4), Florida Statutes.

In the instant case, Fintech's expert, Ivan Zatkovish, identified the following specific trade secrets that were unique to Fintech's software suit, derived independent economic value from not being generally know or ascertainable in the industry, were subject of reasonable efforts to maintain their secrecy,[5] and which were unlawfully misappropriated by iControl:[6]

1.  Fintech's invoice process in the regulated commerce industry, including:[7]

    a.  The database architecture and data structure of Fintech's invoices [2/26 Tr. 54:2-18, 59:5-9], including

        i.  the invoice header, detail, and mandatory use of the vendor item number [2/26 Tr. 54:18-56:4, 58:3-17], and

        ii. the structure and maintenance of service adjustment, promotion, and charge ("SAC") codes [2/26 Tr. 56:5-57:13];

    b.  Fintech's exception rules, including the logic coded into Fintech's system to verify the fields on the invoice [2/26 Tr. 59:10-60-12]; and

    c.  Fintech's in-system editor [2/26 Tr. 60:13-61:24].

---

[5] Mr. Walter Pickel testified regarding Fintech's reasonable efforts to maintain the secrecy of its information. [*See* 2/26 Tr. 159:10-15.]

[6] *See* 2/26 Tr. 138:23-140:3 (summarizing Fintech's trade secrets which were misappropriated by iControl).

[7] *See* 2/26 Tr. 62:2-66:25 (summarizing Fintech's trade secrets and discussing specific examples showing iControl's knowledge and misappropriation of Fintech's trade secrets with respect to the invoice process, including iControl's release of features identical to Fintech's features in iControl's Harmony software).

2.  Fintech's payment process in the regulated commerce industry, including:[8]

    a.  The extraction of information from the invoices and calculation and aggregation of the invoices for processing in one daily ACH transaction [2/26 Tr. 68:9-71:4]; and

    b.  The use of debit filters or "white filters" [2/26 Tr. 71:5-72:12].

3.  Fintech's customer specific and payment reconciliation interfaces [2/26 Tr. 92:6-94:21], including: [9]

    a.  Fintech's FMS customer interface [2/26 Tr. 95:8-16];

    b.  Fintech's 820 interface for Houston Distributing [2/26 Tr. 96:17-98:2]; and

    c.  Fintech's Starbucks interface [2/26 Tr. 98:3-99:1].

4.  Fintech's method and process to develop certain reports, including:[10]

    a.  Fintech's method for developing and including information in its broken case report [2/26 Tr. 125:10-22]; and

    b.  Fintech's method for developing and including information in its price discrepancy report [2/26 Tr. 127:10-23].

---

[8] *See* 2/26 Tr. 80:2-7, 83:24-88:11 (summarizing Fintech's trade secrets and discussing specific examples showing iControl's knowledge and misappropriation of Fintech's trade secrets with respect to the payment process).

[9] *See* 2/26 Tr. 99:2-12 and see generally 2/26 Tr. 92:6-99:1 (summarizing Fintech's trade secrets and discussing specific examples showing iControl's knowledge and misappropriation of Fintech's trade secrets with respect to its specific customer interfaces).

[10] *See* 2/26 Tr. 125:23-127:5 and 127:24-129:2 (summarizing Fintech's trade secrets and discussing specific examples showing iControl's apparent knowledge and misappropriation of Fintech's trade secrets with respect to its method and process to develop the broken case report and price discrepancy report as part of its Next Gen Reconciliation).

5. Fintech's user portal and user interface model [2/26 Tr. 129:6-131:16], including:[11]

   a. Fintech's user portal functions [2/26 Tr. 131:17-24]; and

   b. Fintech's access model for its user portal [2/26 Tr. 131:25-133:9].

As described in Paragraph Nos. 1 through 5 above, iControl's misappropriation of Fintech's trade secrets included aspects of every part of Fintech's regulated commerce software system, from the invoice process to the payment process, as well as specific proprietary functions including in its user portal, customer specific and payment reconciliation interfaces, and method and process to develop broken case and price discrepancy reports.  iControl's representatives testified that iControl did not develop a new software platform for the regulated commerce industry, and that it instead modified its existing Harmony software for the regulated commerce industry. [2/27 Tr.  Tr. 105:25-106:18].  Accordingly, Fintech seeks a permanent injunction prohibiting iControl from using Fintech's proprietary regulated commerce software, including each of Fintech's specific trade secrets listed above.  Because Fintech's trade secrets were incorporated into iControl's Harmony software, Fintech further seeks an injunction prohibiting iControl from using its Harmony software, as modified, for the regulated commerce industry.  Fintech also seeks a permanent injunction prohibiting iControl from using its Next Gen Reconciliation software, which

---

[11] *See* 2/26 Tr. 133:13-138:9 (discussing specific examples showing iControl's knowledge and misappropriation of Fintech's trade secrets with respect to the user portal).

misappropriated Fintech's method and process for developing and including information in its broken case and price discrepancy reports.

In the recent case of *Mapei Corporation v. J.M. Field Marketing, Inc.*, 295 So.3d 1193 (Fla. 4th DCA 2020), a Florida appellate court addressed a similar situation in which the plaintiff sought an injunction prohibiting the use of its trade secrets in a competitor's software program because the competitor has misappropriated the plaintiff's trade secrets in creating the program.  The trial court granted the injunction only to the extent it prohibited the disclosure of specific confidential information of the plaintiff. However, the appellate court reversed and remanded to expand the injunction to prohibit the use of the confidential information and trade secrets by the defendants. *Mapei Corp.*, 295 So.3d at 1201.

The facts in *Mapei* are analogous to those presented in the current case. In *Mapei*, the plaintiff developed "a proprietary web-based inventory management software called All In View ('AIV')," that provided "budget management, real time inventory tracking, reporting, and full-service customer care." *Id.* at 1195-96. The plaintiff made the software available to its customers, and a disgruntled customer "scraped and gathered information from the AIV software" and provided it to a software developer "to mimic AIV and obtain the same services at a lower price."  *Id.* at 1196. The court found the AIV software constituted a trade secret based on the compilation of "unique and not well-known" features including the "proprietary functions and layout, unique abilities capable of being performed on the back end of the system, user permissions to view pages and products, order materials, etc."  *Id.* at 1198.

15

Specifically, the court found that "[a]ltogether, this makes AIV a protected trade secret." *Id.* at 1199

In affirming and expanding the injunction, the appellate court in *Mapei* noted that the evidence supported a finding that the entire software was a trade secret based on the testimony that the AIV software "'allows for detailed processes to be completed in a simplified fashion....  I think one of the biggest part[s] of it is the design behind. It's not essentially as simple as the code, but how the pieces are put together.'" *Mapei Corp.*, 295 So.3d at 1199.  The court further noted that, although the information within the plaintiff's system technically belonged to the customer, "how that data was compiled and manipulated constituted [plaintiff's] trade secret." *Id.*

In the present case, the evidence presented at trial similarly showed that the design and architecture of Fintech's software constituted a trade secret and that iControl misappropriated Fintech's trade secrets for its regulated commerce software. Specifically, Fintech's expert testified as follows:

> [I]n the invoice processing, FinTech had the benefit -- iControl had the benefit of FinTech's knowledge in certain ways that they structure their data, specifically, for example, with invoice. They had the benefit of specific rules that FinTech had developed in verifying their invoices, they had the benefit of knowledge of the invoice fixer or the in-system editor.
>
> In terms of payment processing, as we discussed, the calculations for the ACH transaction, for example, in the various ways of rounding, in the methods to prevent blocked payments, we talked about, among other things, the use of the white filters that FinTech developed and maintained for their individual clients within the banks.  Over here, regarding the system interfaces, we know that FinTech created dozens of customer-specific interfaces for invoice interfaces and for payment reconciliation. IControl had the benefit of FinTech's knowledge in that area.

> And regarding the specific methods for analyzing and producing reports, we know that iControl had literally duplicated the methods for calculating and producing the information on specific analytics reports.
>
> And then regarding the administration of all of the users for accessing that information, we know that Mr. Sanderson and Mr. Lopez directly made copies of FinTech's user portal administration functions describing them in detail, the purpose and the use of those particular functions. So iControl had the benefit of each of those pieces of knowledge from FinTech in order to construct their product.

[2/26 Tr. 138:25-140:3].

The injunction should be unlimited in geographic scope. The RESTATEMENT explains:

> Geographic limitations on the scope of injunctive relief in trade secret cases are ordinarily inappropriate.  A defendant will normally be enjoined from disclosing or using the trade secret even outside the geographic market of the trade secret owner.  The defendant's use of the secret in any market may increase the risk of disclosure to the public and may deprive the plaintiff of potential licensing revenues. Even when direct injury to the plaintiff is unlikely, an injunction unlimited in geographic scope is ordinarily appropriate to deprive the defendant of further unjust enrichment from the appropriation of the trade secret.

RESTATEMENT (THIRD) OF UNFAIR COMPETITION, § 44, cmt. d & Reporter's Note to cmt. d (1995) (*citing Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970 (9th Cir. 1991) (world-wide injunction issued despite plaintiff's sales in only a few countries)).

The injunction should also be unlimited in temporal scope.  "[W]hen a plaintiff makes out a case for injunctive relief, the duty devolves upon the opposing party to show by competent evidence that an order of less duration than a permanent order will afford the injured party adequate protection."  *See, e.g.*, *Hyde Corp. v. Huffines*, 158 Tex. 566, 585, 314 S.W. 2d 763, 776 (1958).  In the instant case, a perpetual

injunction is warranted because there is no evidence that Fintech's trade secrets will lose value or become publicly known with the passage of time.  Even if they were to become publicly disclosed, or if there were other grounds for modification of the injunction, the Court should decline to modify it in the interest of equity. RESTATEMENT (THIRD) OF UNFAIR COMPETITION, § 44, Reporter's Notes to cmt. c (1995) ("Some cases have granted punitive injunctions that go beyond protecting the injured party or preventing unjust enrichment") (*citing Franke v. Wiltschek*, 209 F.2d 493 (2d Cir. 1953) (injunction granted although the trade secret was largely disclosed in an expired patent); *Valco Cincinnati, Inc. v. N & D Machining Service, Inc.*, 24 Ohio St.3d 41, 492 N.E.2d 814 (1986) (upholding a perpetual injunction in order to punish the defendant in light of egregious circumstances); *Analogic Corp. v. Data Translation, Inc.*, 371 Mass. 643, 358 N.E.2d 804 (1976)).

### III.

### CONCLUSION

For the foregoing reasons, Fintech respectfully requests that the Court enter the injunction attached as Exhibit "A."

Respectfully submitted,

/s/ Catherine H. Molloy
Richard C. McCrea, Jr.
Florida Bar No. 351539
Email:  mccrear@gtlaw.com
Catherine H. Molloy
Florida Bar No. 33500
Email: molloyk@gtlaw.com
**GREENBERG TRAURIG, P.A.**
101 E. Kennedy Boulevard
Suite 1900

Tampa, Florida  33602
Telephone: (813) 318-5700
Facsimile:  (813) 318-5900
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on August 26, 2020, I electronically filed the foregoing with the Court by using the CM/ECF system, which will send a notice of electronic filing to:

Robert L. Rocke, Esq.
rrocke@rmslegal.com
Jonathan B. Sbar, Esq.
jsbar@rmslegal.com
Andrea K. Holder, Esq.
aholder@rmslegal.com
ROCKE, McLEAN & SBAR, P.A.
2309 S. MacDill Avenue
Tampa, Florida 33629

Jeffrey S. Bucholtz (*Pro Hac Vice*)
Paul Alessio Mezzina (*Pro Hac Vice*)
KING & SPALDING LLP
1700 Pennsylvania Avenue NW, Suite 200
Washington, DC 20006


/s/ Catherine H. Molloy
Attorney