UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**FINANCIAL INFORMATION
TECHNOLOGIES, LLC,**

    Plaintiff,

v.                                                        CASE NO. 8:17-cv-00190-SDM-SPF

**ICONTROL SYSTEMS, USA, LLC,**

    Defendant.
_____/

## PERMANENT INJUNCTION

Plaintiff Financial Information Technologies, LLC ("Fintech") moves for the entry of a permanent injunction against defendant iControl Systems, USA, LLC ("iControl"). The Court **GRANTS** the motion as follows, for the reasons stated below.

In January of 2017, Fintech sued iControl for misappropriation of trade secrets in violation of the Florida Uniform Trade Secrets Act. [Doc. 1]. On March 2, 2020, the jury found that iControl willfully and maliciously misappropriated Fintech's trade secrets and awarded $2.7 million in compensatory damages and $3 million in exemplary damages. Fintech now seeks entry of a permanent injunction to prevent any further misappropriation of its trade secrets.

The Florida Uniform Trade Secrets Act ("FUTSA") authorizes the Court to permanently enjoin iControl from misappropriating Fintech's trade secrets. *Fla. Stat.* § 688.003 (2019). In trade secrets cases, "both injunctive and monetary relief are appropriate: monetary relief to compensate the plaintiff for existing losses and

injunctive relief to prevent future loss through further use or disclosure of the trade secret." RESTATEMENT (THIRD) OF UNFAIR COMPETITION, § 44, cmt. b & Reporter's Notes to cmt. b (1995);[1] *see also Sensormatic Elecs. Corp. v. TAG Co. US, LLC*, 632 F. Supp. 2d 1147, 1187 (S.D. Fla. 2008) (manufacturer was entitled to permanent injunction under FUTSA prohibiting rival manufacturer from using or disclosing plaintiff's manufacturing specifications because future disclosure or use of the specifications would cause irreparable injury); *Delucca v. GGL Indus., Inc.*, 712 So. 2d 1186, 1187 (Fla. 4th DCA 1998) (affirming entry of permanent injunction under FUTSA prohibiting employee from disclosing former employer's trade secrets); *Thomas v. Alloy Fasteners, Inc.*, 664 So. 2d 59, 60 (Fla. 5th DCA 1995) (same).

The elements required to show entitlement to a permanent injunction are: (1) the plaintiff "has suffered an irreparable injury; (2) th[e] remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) . . . considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) . . . the public interest would not be disserved by a permanent injunction." *800 Adept, Inc. v. Murex Sec., Ltd.*, 505 F. Supp. 2d 1327, 1335 (M.D. Fla. 2007), *aff'd in part, vacated in part, rev'd in part on other grounds*, 539 F.3d 1354 (Fed. Cir. 2008). "Thus, the standard for permanent injunctive relief is essentially the same as for preliminary injunctive relief, except that the movant must show actual success on the merits instead of a likelihood of success on the merits." *B*

---

[1] The Florida Trade Secrets Act "shall be applied and construed to effectuate its general purpose to make uniform the law with respect to the subject of this act among states enacting it." *Fla. Stat.* § 688.009 (2019).

2

*& F Sys. v. Leblanc*, 2012 U.S. Dist. LEXIS 90504, at *20-21 (M.D. Ga. June 29, 2012). In the instant case, Fintech has done so.

Fintech has suffered irreparable injury, and remedies at law are inadequate. "[I]njunctive relief is routinely granted in trade secret cases" because of "[t]he inadequacy of monetary relief and the risk of a destruction of trade secret rights through public disclosure." RESTATEMENT (THIRD) OF UNFAIR COMPETITION, § 44, cmt. c & Reporter's Notes on cmts. b & g (1995) (collecting cases); *Sensormatic Elecs. Corp.*, 632 F. Supp. 2d at 1182, 1187 (future disclosure or use of plaintiff's trade-secret specifications would erode plaintiff's market share, which would cause irreparable injury).

RESTATEMENT (THIRD) OF UNFAIR COMPETITION, § 44, cmt. c (1995).

The balance of hardships favors Fintech because the jury concluded that iControl willfully and maliciously misappropriated Fintech's trade secrets. The jury awarded Fintech compensatory damages for its lost revenue to date, but these damages do not address the ongoing and future damage to Fintech based on its continuing lost revenue. An injunction prohibiting what has been determined to be unlawful would not burden iControl except to the extent iControl intends to continue violating the law. Fintech, on the other hand, faces continuing losses due to the misappropriation of its trade secrets. *See Sensormatic Elecs. Corp.*, 632 F. Supp. 2d at 1182.

Entry of a permanent injunction would in no way disserve the public interest. The public interest is served by strong intellectual property protections. *Id.* (*citing*

*Abbot Labs v. Andrx Pharms., Inc.*, 452 F.3d 1331, 1348 (Fed. Cir. 2006)).  An injunction would also serve the public interest because Fintech's employment agreements with Mark Lopez and Andrew Sanderson prohibit them from disclosing Fintech's trade secrets[2], and "enforcement of a valid restrictive covenant encourages parties to adhere to contractual obligations."  *7-Eleven, Inc. v. Kapoor Bros., Inc.*, 977 F. Supp. 2d 1211, 1230 (M.D. Fla. 2013).

The Florida Uniform Trade Secrets Act authorizes the injunction of specific, identifiable trade secrets.  *See East v. Aqua Gaming, Inc.*, 805 So.d 932, 935 (Fla. 2d DCA 2001); *Norton v. Am. LED Tech., Inc.*, 245 So.3d 968, 969 (Fla. 1st DCA 2018). The FUTSA defines a trade secret as:

> information, including a formula, pattern, compilation, program, device, method, technique, or process that:
>
> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

§ 688.002(4), Florida Statutes.

In the instant case, Fintech identified the following specific trade secrets that were unique to Fintech's software suit, derived independent economic value from not being generally know or ascertainable in the industry, were subject of reasonable

---

[2] Plaintiff's Trial Exhibits 88, 91, 249, and 323.

efforts to maintain their secrecy,[3] and which were unlawfully misappropriated by iControl:[4]

1. Fintech's invoice process in the regulated commerce industry, including:[5]

    a. The database architecture and data structure of Fintech's invoices [2/26 Tr. 54:2-18, 59:5-9], including

        i. the invoice header, detail, and mandatory use of the vendor item number [2/26 Tr. 54:18-56:4, 58:3-17], and

        ii. the structure and maintenance of service adjustment, promotion, and charge ("SAC") codes [2/26 Tr. 56:5-57:13];

    b. Fintech's exception rules, including the logic coded into Fintech's system to verify the fields on the invoice [2/26 Tr. 59:10-60:12]; and

    c. Fintech's in-system editor [2/26 Tr. 60:13-61:24].

2. Fintech's payment process in the regulated commerce industry, including:[6]

---

[3] Mr. Walter Pickel testified regarding Fintech's reasonable efforts to maintain the secrecy of its information. [*See* 2/26 Tr. 159:10-15].

[4] *See* 2/26 Tr. 138:23-140:3 (summarizing Fintech's trade secrets which were misappropriated by iControl).

[5] *See* 2/26 Tr. 62:2-66:25 (summarizing Fintech's trade secrets and discussing specific examples showing iControl's knowledge and misappropriation of Fintech's trade secrets with respect to the invoice process, including iControl's release of features identical to Fintech's features in iCOntrol's Harmony software).

[6] *See* 2/26 Tr. 80:2-7, 83:24-88:11 (summarizing Fintech's trade secrets and discussing specific examples showing iControl's knowledge and misappropriation of Fintech's trade secrets with respect to the payment process).

5

- a. The extraction of information from the invoices and calculation and aggregation of the invoices for processing in one daily ACH transaction [2/26 Tr. 68:9-71:4]; and
- b. The use of debit filters or "white filters" [2/26 Tr. 71:5-72:12].

3. Fintech's customer specific and payment reconciliation interfaces [2/26 Tr. 92:6-94:21], including: [7]

    - a. Fintech's FMS customer interface [2/26 Tr. 95:8-16];
    - b. Fintech's 820 interface for Houston Distributing [2/26 Tr. 96:17-98:2]; and
    - c. Fintech's Starbucks interface [2/26 Tr. 98:3-99:1].

4. Fintech's method and process to develop certain reports, including: [8]

    - a. Fintech's method for developing and including information in its broken case report [2/26 Tr. 125:10-22]; and
    - b. Fintech's method for developing and including information in its price discrepancy report [2/26 Tr. 127:10-23].

5. Fintech's user portal and user interface model [2/26 Tr. 129:6-131:16], including: [9]

---

[7] *See* 2/26 Tr. 99:2-12 and see generally 2/26 Tr. 92:6-99:1 (summarizing Fintech's trade secrets and discussing specific examples showing iControl's knowledge and misappropriation of Fintech's trade secrets with respect to its specific customer interfaces).

[8] *See* 2/26 Tr. 125:23-127:5 and 127:24-129:2 (summarizing Fintech's trade secrets and discussing specific examples showing iControl's apparent knowledge and misappropriation of Fintech's trade secrets with respect to its method and process to develop the broken case report and price discrepancy report as part of its Next Gen Reconciliation).

[9] *See* 2/26 Tr. 133:13-138:9 (discussing specific examples showing iControl's knowledge and misappropriation of Fintech's trade secrets with respect to the user portal).

*ACTIVE 49310641v3*

      a. Fintech's user portal functions [2/26 Tr. 131:17-24]; and

      b. Fintech's access model for its user portal [2/26 Tr. 131:25-133:9].

As described in Paragraph Nos. 1 through 5 above, iControl's misappropriation of Fintech's trade secrets included aspects of every part of Fintech's regulated commerce payment software system, from the invoice process to the payment process, as well as specific proprietary functions including in its user portal, customer specific and payment reconciliation interfaces, and method and process to develop broken case and price discrepancy reports. iControl's representatives testified that iControl did not develop a new software platform for the regulated commerce industry, and that it instead modified its existing Harmony software for the regulated commerce industry. [2/27 Tr. Tr. 105:25-106:18]. Accordingly, Fintech is entitled to a permanent injunction prohibiting iControl from using Fintech's proprietary regulated commerce software, including each of Fintech's specific trade secrets listed above. Because Fintech's trade secrets were incorporated into iControl's Harmony software, the injunction should also prohibit iControl from using its Harmony software, as modified, for the regulated commerce industry. Finally, the injunction should prohibit iControl from using its Next Gen Reconciliation software, which misappropriated Fintech's method and process for developing and including information in its broken case and price discrepancy reports. *See, e.g. Mapei Corporation v. J.M. Field Marketing, Inc.*, 295 So.3d 1193 (Fla. 4th DCA 2020) (affirming and expanding injunction to prohibit defendants' use of trade secrets including proprietary software).

7

Given the nature of trade secret misappropriation, it is appropriate for the injunction to be unlimited in geographic and temporal scope. RESTATEMENT (THIRD) OF UNFAIR COMPETITION, § 44, cmt. d & Reporter's Note to cmt. d (1995) (*citing Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970 (9th Cir. 1991) (world-wide injunction issued despite plaintiff's sales in only a few countries)); *Hyde Corp. v. Huffines*, 158 Tex. 566, 585, 314 S.W.2d 763, 776 (1958) ("[W]hen a plaintiff makes out a case for injunctive relief, the duty devolves upon the opposing party to show by competent evidence that an order of less duration than a permanent order will afford the injured party adequate protection.").

Accordingly:

I.   iControl is enjoined from disclosing or otherwise making use of the following trade secret information belonging to Fintech:

    (A)   Fintech's regulated commerce software system, including the following specific trade secrets:

        1. Fintech's invoice process in the regulated commerce industry, including:

            a. The database architecture and data structure of Fintech's invoices, including the invoice header, detail, and mandatory use of the vendor item number, and the structure and maintenance of service adjustment, promotion, and charge ("SAC") codes;

8

  b. Fintech's exception rules, including the logic coded into Fintech's system to verify the fields on the invoice; and

  c. Fintech's in-system editor.

2. Fintech's payment process in the regulated commerce industry, including:

  a. The extraction of information from the invoices and calculation and aggregation of the invoices for processing in one daily ACH transaction; and

  b. The use of debit filters or "white filters."

3. Fintech's customer specific and payment reconciliation interfaces, including:

  a. Fintech's FMS customer interface;

  b. Fintech's 820 interface for Houston Distributing; and

  c. Fintech's Starbucks interface.

4. Fintech's method and process to develop certain reports, including:

  a. Fintech's method for developing and including information in its broken case report; and

  b. Fintech's method for developing and including information in its price discrepancy report.

5. Fintech's user portal and user interface model, including:

  a. Fintech's user portal functions; and

*ACTIVE 49310641v3*

        b.  Fintech's access model for its user portal;

(B)    iControl's Harmony software, as modified, for the regulated commerce industry; and

(C)    iControl's Next Gen Reconciliation software to the extent it includes broken case and price discrepancy reports.

This prohibition includes selling, leasing, or otherwise conveying any information, technology, or other product that was developed with, or otherwise makes use of, Fintech's trade secrets.

    II.    Within two (2) weeks of the date this Order is entered, iControl must erase or return all documents, software, or other media on which information is stored or manipulated, which contain or make use of Fintech's trade secrets.

    III.    The persons bound by this injunction include iControl, its officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation therewith.

    IV.    This Permanent Injunction shall remain in effect until dissolved or amended by the Court.

    ORDERED in Tampa, Florida, on _____, 2020.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE

Copies furnished to counsel

ACTIVE 49310641v3